STATE OF CONNECTICUT *v.* MAURICE FLANAGAN*
(AC 24539)

Dranginis, Flynn and Bishop, Js.

___

* Subsequent to the decision of this appeal, this court granted the defendant's motion for reconsideration and reargument en banc. Part II of this opinion, pages 468–69, has been superseded by *State* v. *Flanagan*, 102 Conn. App. 105, 925 A.2d 385 (2007).

*(One judge dissenting)*

Argued October 24, 2005—officially released January 31, 2006

*Richard W. Callahan*, special public defender, for the appellant (defendant).

*Nancy L. Chupak*, assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, *Kevin J. Murphy*, senior assistant state's attorney,

and *Herbert E. Carlson, Jr.*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

DRANGINIS, J. The defendant, Maurice Flanagan, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-48 (a).[1] On appeal, the defendant claims that (1) there was insufficient evidence to support the jury's verdict and (2) the court denied him the constitutional right to represent himself. We disagree and accordingly affirm the judgment of the trial court.

This appeal concerns another chapter in the hostile, violent and deadly rivalry between two street gangs, the Latin Kings and Los Solidos. See, e.g., *State* v. *Ramos*, 261 Conn. 156, 173, 801 A.2d 788 (2002); *State* v. *Torres*, 242 Conn. 485, 487, 698 A.2d 898 (1997).

The jury reasonably could have found the following facts. On May 5, 1994, Chanito Roman, a member of Los Solidos was killed in a drive-by shooting. Los Solidos members believed that the Latin Kings were responsible for his death. While attending Roman's wake, the state-wide leader of Los Solidos, George Rivera, ordered members of that gang to kill two members of the Latin Kings for every Los Solidos member killed by the Latin Kings. The defendant heard Rivera's order. The defendant then approached the head of the local Los Solidos organization, Aramy Rivera, and urged him to avenge Roman's death.

Following the wake, the defendant and other Los Solidos met at the home of Pennie Yonan to discuss

---

[1] The jury found the defendant not guilty of two counts murder in violation of General Statutes §§ 53a-54a (a) and 53a-8, two counts of attempt to commit murder in violation of General Statutes §§ 53a-54a (a), 53a-8 and 53a-49 (a) (2), and one count of conspiracy to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-48 (a).

their response to Roman's death. Aramy Rivera told the assembled group to "do a mission" on the Latin Kings. The defendant was eager to oblige. George Rivera agreed to provide the local organization with a stolen vehicle, and Yonan acquired black ski masks and sweatshirts for the group. On May 13, 1994, the defendant took an AK-47 rifle and some bullets to Yonan's home and stored them in an upstairs bedroom where other Los Solidos weapons were kept. When Yonan asked the defendant what he was going to do with the weapon, the defendant told her that it was for the Latin Kings and for Roman. Los Solidos members waited for an opportunity to carry out their plan.

On Saturday, May 14, 1994, members of both gangs attended a keg party in a field in New Britain. During the party, two men, one from each gang, argued and were about to engage in a fistfight when a member of the Latin Kings drew a gun, pointed it at the man associated with Los Solidos and told the two men to stop fighting. Hector Rodriguez and Patrick Gannon, members of the Latin Kings, thereafter left the party with Walter Rodriguez and went to Walter Rodriguez' home. While they were standing on the sidewalk, Alex Morales, a Los Solidos member, saw the three men with weapons. Via telephone, Morales communicated his observations to leaders of the local Los Solidos organization and was informed that "they were taking care of it." Morales later saw the three men leave the area in a white Monte Carlo (white vehicle).

Subsequent to receiving the telephone message from Morales, leaders of the local Los Solidos organization talked with a few members of the gang and confirmed that a member of the Latin Kings had drawn a gun on someone associated with them. Larry Gatlin was not yet a member of Los Solidos, but wanted to become one. Gatlin informed Los Solidos leaders that he wanted to participate in "catching wreck" on the Latin Kings.

"Catching wreck" is the gang's term for fighting or "retaliating in kind." A number of Los Solidos, including the defendant, gathered at Yonan's house. The defendant and another member of Los Solidos retrieved the gang's weapons, a Glock nine millimeter pistol, two revolvers, two .38 caliber handguns, the AK-47 rifle and bullets. Aramy Rivera ordered the defendant to clean the weapons to remove any fingerprints on them. Everyone except Aramy Rivera put on gloves and a black hooded sweatshirt. Aramy Rivera kept a blue and red bandana, the gang's colors, on his head because "this was for [Roman]."

George Rivera, the state leader, had provided the local Los Solidos with the requested stolen vehicle, which was parked on the street near Yonan's house. When Los Solidos members left Yonan's house, the defendant was carrying the Glock pistol and the AK-47 rifle. Following some logistical movements, the defendant and two other Los Solidos members got into the stolen vehicle. The defendant was seated in the front passenger seat. Aramy Rivera told the men to "catch wreck" and not to return without "catching wreck." The men in the stolen vehicle later met Gatlin, who joined them, and told them that the Latin Kings were in a "big, old white car." The defendant and three coconspirators went in search of the white vehicle.

Los Solidos members in the stolen vehicle did not find the white vehicle in the housing complex where it was last seen, so they drove through New Britain until they saw it on West Main Street. They followed the white vehicle. At approximately 9:50 p.m., when the white vehicle was stopped at the intersection of Overlook and Selander Streets, the defendant told the operator of the stolen vehicle to turn off the lights and to drive to the side of the white vehicle. Gatlin told the defendant to move his seat forward, which he did. Gatlin then stuck a rifle out the window, and the defendant

took out the Glock pistol. As the stolen vehicle was driven around the white vehicle, Gatlin began to shoot. The defendant also shot his weapon, which contained seventeen rounds. The side windows of the white vehicle were shattered, and the vehicle rolled into the intersection and struck the curb. The defendant and one of the backseat passengers got out of the stolen vehicle and continued to shoot at the white vehicle. Suddenly, the white vehicle moved in reverse and turned left on to Governor Street. The defendant ran after it, continuing to fire his weapon. The defendant got back into the stolen vehicle and ordered the operator to follow the white vehicle. The stolen vehicle went off the road when the operator lost control of it. Los Solidos abandoned the chase. The defendant returned to Yonan's house with the AK-47 rifle. To Yonan, the defendant seemed happy. After he changed his clothing, the defendant went out with other members of Los Solidos to the apartment of Veronica Reyes. According to Reyes, the group was laughing and celebrating something.

Inside the white vehicle at the time of the shooting were Walter Rodriguez and Reinaldo Mercado and two members of the Latin Kings, Gannon and Hector Rodriguez. Both Hector Rodriguez and Gannon were struck in the head by bullets and died of their injuries. During an autopsy of Gannon's body, a bullet was removed from his brain. It was a .30 caliber bullet with markings consistent with having been fired from an AK-47 rifle. Walter Rodriguez was shot in his right arm and side, and his left thumb and wrist. The bullet that struck his right side penetrated his spleen and diaphragm. Mercado sustained cuts to his face.

Gary Chute, Jr., a member of the New Britain police department, recovered nine nine millimeter shell casings at the intersection of Overlook and Selander Streets that night. The shell casings were consistent with having been fired from a Glock firearm.

The jury found the defendant guilty of conspiracy to commit assault in the first degree. The defendant filed motions for judgment notwithstanding the verdict, and for a new trial and a judgment of acquittal, all of which were denied.

I

The defendant first claims that the state did not present sufficient evidence for the jury to find him guilty of conspiracy to commit assault in the first degree in violation of §§ 53a-59 (a) (1) and 53a-48 (a). More specifically, he claims that the state presented evidence of a conspiracy only to commit murder, a charge of which he was acquitted. The defendant claims that the state did not present evidence of a conspiracy to cause serious physical injury, as required by the statutes with which he had been charged. The defendant's claim is contrary to the evidence and the law. See, e.g., *State* v. *Murray*, 254 Conn. 472, 482–83, 757 A.2d 578 (2000), and *State* v. *Rodriguez*, 180 Conn. 382, 403–405, 429 A.2d 919 (1980).

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude

that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Rivera*, 90 Conn. App. 312, 315–16, 876 A.2d 606, cert. denied, 275 Conn. 925, 883 A.2d 1250 (2005).

"It is undisputed that, to sustain a conviction under § 53a-48 (a), the state had to establish, beyond a reasonable doubt, that the defendant had agreed with one or more persons to engage in criminal conduct. Specifically, the state had to show not only that the conspirators intended to agree but also that they *intended to commit the elements of the offense.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Asberry*, 81 Conn. App. 44, 48, 837 A.2d 885, cert. denied, 268 Conn. 904, 845 A.2d 408 (2004). "The existence of a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act." (Internal quotation marks omitted.) *State* v. *Estrada*, 28 Conn. App. 416, 420–21, 612 A.2d 110, cert. denied, 223 Conn. 925, 614 A.2d 828 (1992), quoting *State* v. *Holmes*, 160 Conn. 140, 149, 274 A.2d 153 (1970).

"A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ." General Statutes § 53a-59 (a) (1). " 'Serious physical injury' means physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ." General Statutes § 53a-3 (4). "A person is guilty of conspiracy when, with

intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy." General Statutes § 53a-48 (a).

The defendant has argued that the state presented evidence of a conspiracy only to commit murder. Although there was evidence that after Roman's wake, members of the local Los Solidos organization decided to take revenge for Roman's death by following George Rivera's order to kill two members of the Latin Kings for every member of Los Solidos killed by the rival gang, there also was evidence that on May 14, 1994, members of Los Solidos were motivated to "catch wreck" for the nonfatal incident that occurred at the keg party earlier in the afternoon. We have no idea how the jury reached its verdict, but it could have construed "catching wreck" to mean something less than murder. We need not base our decision on this possibility, however, because, as a matter of law, our Supreme Court has held that the intent to cause death necessarily includes the intent to cause serious physical injury. *State* v. *Rodriguez*, supra, 180 Conn. 402–405.

"The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. This is especially true where a person has caused the death of another person. The death of a person may be caused by a purely accidental act or omission of another . . . or it may come about as the result of long and careful planning, for which the law prescribes severe penalties. Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proved by circumstantial evidence . . . .

"Where the state is faced with a homicide prosecution, it may, in good faith and where the circumstances reasonably warrant, assume that an accused acted with the most culpable state of mind. But where the evidence is reasonably susceptible of another conclusion, [the trier of fact] . . . should not be bound by that assumption and forced by its verdict to choose only between the offense with the most culpable state of mind and acquittal. Such a result would limit the jury's function of determining questions of fact . . . ." (Citations omitted.) Id., 404.

"In *State* v. *Montanez*, 219 Conn. 16, 21, 592 A.2d 149 (1991), [our Supreme Court] concluded that, although the evidence in that case permitted the inference that the defendant had intended only to injure the victim, '[i]t did not preclude the equally permissible inference that the defendant [had] intended to kill the victim . . . .' The converse is equally true. As [the court has] determined previously, under some circumstances, the intent to cause death and the intent to cause serious physical injury may be possessed simultaneously." *State* v. *Murray*, supra, 254 Conn. 481. "It is difficult to imagine how the intent to cause death does not encompass an intent to injure when death is the ultimate impairment of one's physical condition. Therefore, one cannot intend to cause death without necessarily intending to cause a physical injury." Id., 482–83. On the basis of the guidance provided by our Supreme Court, we conclude, therefore, that one who conspires to cause death also conspires to cause serious physical injury.

For the foregoing reasons, we conclude that there was sufficient evidence before the jury for it to find, in a manner consistent with our law, that the defendant was guilty of conspiracy to commit assault in the first degree.

## II

The defendant's second claim is that the court improperly denied him due process of law and the constitutional right to represent himself by failing to canvass him pursuant to Practice Book § 44-3[2] and applying an incorrect legal standard to his motion to proceed pro se.[3] We are not persuaded because the test articulated in Practice Book § 44-3 is applied to determine whether a criminal defendant is waiving his sixth amendment right to counsel in an intelligent, voluntary and knowing manner. When a defendant indicates during trial that he wants to represent himself, the court is to exercise its discretion as to whether to turn to Practice Book § 44-3.

With respect to his claim, the defendant concedes that he failed to bring Practice Book § 44-3 to the trial court's attention and asks this court to review his claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and the plain error doctrine. See Practice Book § 60-5. We will review the defendant's claim pursuant to *Golding* because the record is adequate for our review and the claim is one of constitu-

---

[2] Practice Book § 44-3 provides: "A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself or herself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self-representation."

[3] The defendant provided no constitutional analysis pursuant to the constitution of Connecticut. We therefore confine our review to the federal constitution.

tional magnitude. The defendant cannot prevail, however, because a constitutional violation does not clearly exist, and the court's refusal to let the defendant represent himself also was not plain error.

The defendant's claim concerns the following facts. After the state rested its case, counsel met with the court in chambers. At that time, defense counsel informed the court that he would not present any evidence and that the defendant disagreed with his trial strategy. When court reconvened, the court addressed the defendant, telling him that it was aware of counsel's trial strategy and that the defendant disagreed with it. The defendant responded by informing the court that he had been convicted in a prior trial in which his counsel had not presented evidence. The defendant considered his current counsel's strategy to be too narrow. He wanted to give the jurors other options to consider. He likened his counsel's strategy to that of a pawn in a game of chess, i.e., it attacked in only one direction.

The court told the defendant that trial strategy was a decision for counsel to make after consulting with his client. The court questioned the defendant and his counsel, and determined that counsel had met with the defendant and explained his strategy. The court explained to the defendant that his counsel is "a very experienced attorney. He has tried many cases. I've had the opportunity to observe his performance in this case from . . . January 8, 2003, when we had some hearings on motions. And as far as I'm concerned, his performance has been beyond competent and been superior. If these are his decisions, I'm sure he has given them ample consideration. I'm sure he has taken into consideration your feelings about it, and those are decisions that are left to the attorney for good reason, sir." Nonetheless, the defendant stated that he wanted to call an unnamed Federal Bureau of Investigation (FBI) infor-

mant, who would testify that the defendant had been in another city at the time of the crime.

The court canvassed the defendant about his right to testify and elicited from the defendant that counsel had advised him of his right to testify or not to testify. The defendant stated that he would not testify. The court then addressed both counsel, informing them that the court would give to the jury the standard charge regarding a defendant's right to testify or not to testify. The defendant interrupted the proceedings.

"[The Defendant]: Excuse me, Your Honor. Don't I have the right to finish this case myself without him there?

"The Court: In a word, no. *But are you making that request to represent yourself in the remainder of the case?*

"[The Defendant]: I mean, if he's not going to do what I feel is in my best interest, I don't think that he should be my attorney. I mean, this is my life. Like I explained to him, when this is over, if I lose, he just goes on to another case. I'm the one who has to go to jail. And he's not doing what I feel is in my best interest. He's doing what he feels is in his best interest, not mine. So, I don't understand how his interest comes before my interest.

"The Court: Well, it doesn't appear to me . . . based on my observations of [defense counsel's] performance from January 8, 2003, to today, which is March 18, 2003, that his decisions and his actions have been in his interest as opposed to yours. So, I'm—and I can't imagine why he'd be changing courses now. I mean, [defense counsel's] decisions, as best as I have observed, have been solely in your interest. And his performance has been beyond competent and, in my view, superior over the last two and one-half months.

So, while you may disapprove of his trial tactics, and I understand your feelings, his obligation is to consult with you and then to make his best professional decisions. The fact that you disagree with him over trial tactics does not, at this stage of the case where the state is about to rest, after we have been on trial essentially for about two and one-half months, does not constitute the kind of exceptional circumstances that I would have to find in order for me to allow you either to have a new lawyer or to represent yourself at this point in time. *So, if you're making a request of me that you be allowed to represent yourself or that you be allowed to retain or have new counsel appointed for you, that request is denied.*" (Emphasis added.) The defendant did not respond, and the court moved on to other business.

The defendant's claim on appeal is that the court applied the wrong standard in determining whether to let him act as his own counsel for the remainder of the trial. He contends that the court should have canvassed him pursuant to Practice Book § 44-3 rather than ruling that exceptional circumstances did not exist to permit him to retain new counsel or to represent himself. The state has argued that because the defendant's motion to proceed pro se was not clear and unequivocal and was untimely, among other things,[4] he failed to assert

---

[4] The state argued in its brief that there are multiple conditions that the defendant had to satisfy before he could waive his constitutional right to counsel and proceed pro se. One condition is that the request must be clear and unequivocal. *State* v. *Carter*, 200 Conn. 607, 612, 513 A.2d 47 (1986). "In *Faretta* v. *California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975), the court suggested three grounds for denying a defendant his right to self-representation: (1) he makes the request in untimely fashion such that granting it would disrupt the proceedings; id., 807; (2) the defendant engages in serious obstructionist misconduct; id., 834 n.46; and (3) the defendant has not knowingly and intelligently waived his right to counsel. Id., 835; see 2 W. LaFave & J. Israel, Criminal Procedure (1984) § 11.5 (d), pp. 47–49." (Internal quotation marks omitted.) *State* v. *Townsend*, 211 Conn. 215, 221 n.4, 558 A.2d 669 (1989).

his constitutional right to represent himself. We agree with the state.

"[Practice Book § 44-3] was adopted in order to implement the right of a defendant in a criminal case to act as his own attorney . . . . *Before a trial court may accept a defendant's waiver of counsel,* it must conduct an inquiry in accordance with [Practice Book § 44-3], in order to satisfy itself that the defendant's decision to waive counsel is knowingly and intelligently made." (Emphasis added; internal quotation marks omitted.) *State* v. *Diaz,* 274 Conn. 818, 829, 878 A.2d 1078 (2005). "Although it may be settled law that a criminal defendant has an absolute right to self-representation, that right is not self-executing." (Internal quotation marks omitted.) *State* v. *Bangulescu,* 80 Conn. App. 26, 41, 832 A.2d 1187, cert. denied, 267 Conn. 907, 840 A.2d 1171 (2003). Claims concerning a violation of Practice Book § 44-3 frequently occur in the context of a claim that the court improperly permitted the defendant to represent himself.[5] See, e.g., *State* v. *Diaz,* supra, 828–29; *State* v. *D'Antonio,* 274 Conn. 658, 705–14, 877 A.2d 696 (2005); *State* v. *Ming Zhi Li,* 90 Conn. App. 52, 54–58, 875 A.2d 579 (2005); *State* v. *Gaston,* 86 Conn. App. 218, 228–35, 860 A.2d 1253 (2004), cert. denied, 273 Conn. 901, 867 A.2d 840 (2005).

Our Supreme Court decided the factual and legal issue presented here in *State* v. *Carter,* 200 Conn. 607,

---

[5] "The clear and unequivocal request formulation has been said to have developed primarily as a standard designed to minimize abuses by criminal defendants who might be inclined to manipulate the system. See generally comment, 'The Right to Appear Pro Se: Developments in the Law,' 59 Neb. L. Rev. 135, 141–43 (1980). If an unequivocal request were not required, convicted criminals would be given a ready tool with which to upset adverse verdicts after trials at which they had been represented by counsel. . . . *United States ex rel. Maldonado* v. *Denno,* 348 F.2d 12, 16 (2d Cir. 1965), cert. denied sub nom. *DiBlasi* v. *McMann,* 384 U.S. 1007, 86 S. Ct. 1940, 16 L. Ed. 2d 1020 (1966) . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Gethers,* 197 Conn. 369, 377 n.8, 497 A.2d 408 (1985).

611–15, 513 A.2d 47 (1986).[6] "There is no doubt that a defendant has a right under both the state and the federal constitutions to represent himself at his criminal trial." Id., 611. "The constitutional right of self-representation depends, however, upon its invocation by the defendant in a clear and unequivocal manner." Id., 612. "In the absence of a clear and unequivocal assertion of the right to self-representation, a trial court has no independent obligation to inquire into the defendant's interest in representing himself, because the right of self-representation, unlike the right to counsel, is not a critical aspect of a fair trial, but instead affords protection to the defendant's interest in personal autonomy." Id., 613. "When a defendant's assertion of the right to self-representation is not clear and unequivocal, recognition of the right becomes a matter entrusted to the exercise of discretion by the trial court." Id., 613–14. "In the exercise of that discretion, the trial court must weigh into the balance its obligation to indulge in every reasonable presumption against waiver of the right to counsel." (Internal quotation marks omitted.) Id., 614.

In *Carter*, the defendant voiced dissatisfaction with his counsel, particularly "that his public defender was not properly examining prosecution witnesses so as to expose the alleged falsity of their testimony, and complained that the public defender did not want him to testify. In the course of that colloquy with the court, he stated: 'I am misrepresented and now I have to represent myself.' [The defendant later stated that] 'I'll have to represent myself.' Although he subsequently reiterated his desire to question a witness, that request was again couched in terms of his request for a different public defender." Id., 611. Our Supreme Court reasoned that the trial court "responded to the defendant's concerns by providing explanations concerning trial proce-

---

[6] *Carter* cites numerous federal and state court decisions in accord with its holding. See *State* v. *Carter*, supra, 200 Conn. 612–14.

dures and by offering the defendant repeated opportunities for further consultations with counsel. The defendant's apparent acquiescence in the continuation of trial with appointed counsel demonstrates that the trial court did not abuse its discretion in its conduct of the defendant's case." Id., 614–15.

The facts at issue here cannot be distinguished from the facts of *Carter*. The defendant here questioned whether he had the right to represent himself in the context of disagreeing with his counsel's trial strategy. Each time the defendant posed a question to the court or expressed his feelings, the court responded with understanding as to the defendant's feelings and gave information to answer the questions. The court explained to the defendant that counsel is to consult with the client, but that trial strategy is a decision for counsel to make. The court recognized the defendant's concerns, given his prior conviction. The court also told the defendant that on the basis of his observations over two and one-half months of trial, defense counsel's performance was more than competent, it was superior. The defendant never responded to the court's explanations by asserting a clear and unequivocal request to represent himself. We particularly are persuaded by the fact that the court specifically asked the defendant if he was making a request to represent himself. The defendant responded in an equivocal manner by posing yet another question. Our conclusion that the defendant's request to represent himself was not clear and unequivocal is buttressed by the court's lack of understanding as to what the defendant was requesting when it ruled: "So, if you're making a request of me that you be allowed to represent yourself *or* that you be allowed to retain or have new counsel appointed for you, that request is denied." (Emphasis added.) The defendant thereafter made no effort to make clear to the court what he wanted.

The state also has argued that the defendant's request to proceed pro se was untimely, as it was made at the conclusion of the state's case. At that time, the defendant stated to the court that he wanted to present the testimony of an unidentified FBI informant to give the jury options to consider during deliberations. In response to that argument, the defendant responded in his reply brief that Practice Book § 44-3 provides that a defendant may waive the right to counsel and represent himself at *any stage of the proceedings* and that failure to comply with the terms of the rules of practice is plain error, but he cited no law to support his argument. The defendant has misconstrued the rule of practice.

"The rules of statutory construction apply with equal force to Practice Book rules. . . . A basic tenet of statutory construction is that when a statute [or a rule of practice] is clear and unambiguous, there is no room for construction. . . . When we have occasion to construe rules of criminal procedure, they are to be strictly construed to protect the fundamental constitutional right to liberty. . . . *State* v. *Genotti*, 220 Conn. 796, 807, 601 A.2d 1013 (1992)." (Internal quotation marks omitted.) *State* v. *Francis D.*, 75 Conn. App. 1, 13 n.5, 815 A.2d 191, cert. denied, 263 Conn. 909, 819 A.2d 842 (2003). Practice Book § 44-3 provides in relevant part that a defendant may represent himself "at any stage of the proceedings . . . ." It does not provide that the defendant may assert that right at any stage of the proceeding. Federal courts have established that a timely assertion of the right to represent one's self is necessary to invoke that federal constitutional right.

Even though the right to self-representation is founded in the federal constitution, the United States Supreme Court has suggested that the request must be timely so that it does not disrupt the proceedings. *Faretta* v. *California*, 422 U.S. 806, 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975) ("[w]ell before the date of trial").

Legal scholars have noted with respect to the decisions of federal courts that "*Faretta* suggests only three possible grounds for denying [a clear and unequivocal] request. . . . *Faretta* stressed that the request in that case was made '[w]ell before the date of trial.' This suggests that, at some point, a request might be so disruptive of the orderly schedule of proceedings as to justify rejection on that ground alone. Provided [the] defendant does not demand additional time to prepare, lower courts generally deem pro se motions to be timely as long as they are made before trial. On the other hand, the trial court is recognized as having broad discretion to reject as untimely a request made during the course of trial." 3 W. LaFave, J. Israel & N. King, Criminal Procedure (1999) § 11.5 (d), pp. 582–83.

There are several cases decided by the United States Court of Appeals for the Second Circuit that have acknowledged or abided by the timeliness rule. In the context of the federal statutory right to self-representation in a civil action, the Second Circuit has stated that "[t]he few qualifications which this court has put on the clear language of self-representation clause of [28 U.S.C.] § 1654 are consistent with its high purpose. One such qualification, enunciated in criminal cases, see *United States* v. *Bentvena*, 319 F.2d 916, 938 [(2d Cir.), cert. denied sub nom., *Ormento* v. *United States*, 375 U.S. 940, 84 S. Ct. 345, 11 L. Ed. 2d 271 (1963)]; *United States ex rel. Maldonado* v. *Denno*, 348 F.2d 12, 15 (2[d] Cir. 1965), [cert. denied sub nom., *DiBlasi* v. *McMann*,] 384 U.S. 1007, 86 S. Ct. 1950, 16 L. Ed. 2d 1020 (1966), but equally applicable in civil cases, is that the right to self-representation must be timely asserted. The right is 'unqualified' if invoked prior to trial but is 'sharply curtailed' if first asserted after the trial has begun. [*United States ex rel. Maldonado* v.] *Denno*, supra, 348 F.2d at 15. *An untimely request is committed to the discretion of the trial court*, which may consider,

among other factors, the reason for the request, the quality of counsel representing the moving party, the party's prior proclivity to substitute counsel, and the potential disruption to the proceedings. See *Sapienza* v. *Vincent*, 534 F.2d 1007, 1010 (2[d] Cir. 1976)." *O'Reilly* v. *New York Times Co.*, 692 F.2d 863, 867–68 (2d Cir. 1982).[7]

The facts here are undisputed that the defendant expressed his dissatisfaction with his counsel's strategy at the conclusion of the state's case. Before the court could permit the defendant to proceed pro se, however, it would have had to discharge his counsel. The standard of review of a motion to discharge counsel is abuse of discretion. *State* v. *Fisher*, 57 Conn. App. 371, 382, 748 A.2d 377, cert. denied, 253 Conn. 914, 754 A.2d 163 (2000); see also 3 W. LaFave, J. Israel & N. King, supra, p. 583 n.60 (motion made during course of trial analogized to motion to switch counsel during trial, rests in sound discretion of court). We conclude that even if the defendant's motion could be construed as a request to proceed pro se, the court acted well within its discretion.

"It is *within the trial court's discretion* to determine whether a factual basis exists for appointing new counsel and, absent a factual record revealing an abuse of discretion, the court's refusal to appoint new counsel is not improper. . . . Moreover, appellate tribunals look with a jaundiced eye at complaints regarding adequacy of counsel made on the eve of trial . . . . Such a request must be supported by a substantial reason and, [i]n order to work a delay by a last minute discharge of counsel there must exist exceptional circumstances."

---

[7] This rule of discretion and factors to be considered with respect to motions to proceed pro se made during trial have been adopted by the courts of a number of states. See, e.g., *State* v. *Christian*, 657 N.W.2d 186, 193–94 (Minn. 2003); *State* v. *Fuller*, 337 S.C. 236, 241, 523 S.E.2d 168 (1999); *State* v. *Bean*, 171 Vt. 290, 297–98, 762 A.2d 1259 (2000).

(Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Fisher*, supra, 57 Conn. App. 382. "While courts must be assiduous in their defense of an accused's right to counsel, that right may not be manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice. *United States* v. *Calabro*, 467 F.2d 973, 986 (2d Cir. 1972), [cert. denied sub nom. *Tortorello* v. *United States*, 410 U.S. 926, 93 S. Ct. 1357, 35 L. Ed. 2d 587 (1973)], quoting *United States* v. *Bentvena*, [supra, 319 F.2d 936]." (Internal quotation marks omitted.) *State* v. *Patavino*, 51 Conn. App. 604, 609, 724 A.2d 514, cert. denied, 249 Conn. 919, 733 A.2d 236 (1999).

Here, the court found no exceptional circumstances to warrant the discharge of the defendant's counsel immediately prior to final arguments. Although the defendant asserted that he had an alibi witness, he failed to identify the witness and where the witness was located. Factual determinations regarding the discharge of counsel are to be made by the court. *State* v. *Fisher*, supra, 57 Conn. App. 382. Credibility is a question of fact. *State* v. *Farnum*, 275 Conn. 26, 38, 878 A.2d 1095 (2005). The court had a high opinion of defense counsel.[8] Appellate court judges, like jurors, do not leave their common sense at the courthouse door. It is implausible that defense counsel of the caliber described by the court would fail to investigate an alibi witness if the defendant had made that person known to counsel. We conclude therefore that the court did not abuse its discretion in determining that no exceptional circumstances existed to permit the defendant to discharge his counsel at the conclusion of the state's case. To

---

[8] The court found the caliber of representation provided by defense counsel to be superior. On the basis of the record before this court, we are inclined to agree with that opinion. The defendant was charged with six serious crimes, including murder, and was convicted of only the least serious charge.

have permitted the defendant to proceed pro se at that stage of the proceedings would have been disruptive to the judicial proceeding.[9]

The judgment is affirmed.

In this opinion BISHOP, J., concurred.

FLYNN, J., dissenting. I respectfully dissent. First, I disagree with the majority's holding that the defendant's request to represent himself was equivocal. Second, I disagree with the adoption of a per se rule that any request for self-representation is untimely if made after trial begins and that an exceptional circumstances test be applied to such requests. Third, I disagree with the rule adopted by the majority that states that the trial court has unbridled discretion in whether to assess the voluntary, intelligent and knowing exercise of the constitutional right to self-representation when that right is exercised after the start of trial.

At the outset, I emphasize that I do not criticize the competency of the defendant's trial attorney, whose efforts contributed to the acquittal on five of the charges against the defendant.[1]

---

[9] With all due respect to the dissent's right to view the essence of the defendant's remarks to the trial court as a request to proceed pro se, the majority takes exception to the dissent's characterization of its holding as the adoption of a *per se rule* that any request for self-representation is untimely if made after trial begins. The majority opinion stands for the proposition that the denial of an untimely request to proceed pro se is not per se a violation of a defendant's constitutional right to self-representation. Whether a request to proceed pro se is untimely is a matter to be left to the discretion of the trial court. The federal law cited by the majority applies to the facts of this case. The majority recognizes that under a different factual scenario, a trial court may well conclude that the defendant's assertion of his right to proceed pro se would not disrupt the proceedings, even if raised during the middle of trial.

[1] The defendant's unpreserved claim is reviewed under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). His claim satisfies *Golding* because, contrary to the majority's assertion, a constitutional violation clearly does exist, and *Golding*'s fourth prong does not apply because the denial of the right to self-representation is not subject to harmless error

However, when the sixth amendment "right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins." *State v. Wolf*, 237 Conn. 633, 654, 678 A.2d 1369 (1996). The waiver proceedings necessarily must begin with the defendant's request.

I turn first to whether the defendant's request for self-representation was unequivocal and therefore sufficient to warrant a waiver hearing. The sixth amendment to the United States constitution guarantees not just the right to counsel, but also the right to represent oneself. *Faretta v. California*, 422 U.S. 806, 832, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). Although I agree that the assertion of the right must be clear and unequivocal, it is evident from the record that the trial court thought that the defendant adequately enough expressed that choice because the court clearly and unequivocally denied the defendant that right on March 18, 2002.

The colloquy began when the defendant asked the court, "Excuse me, Your Honor, don't I have the right to finish this case without [defense counsel]?" To which the court responded: "In a word, no." At the end of this colloquy, which began with the defendant's inquiry about whether he had the right of self-representation, the court stated: "So, if you are making a request of me that you be allowed to represent yourself or that you be allowed to retain or have new counsel appointed for you, that request is denied."[2] Two days after its

analysis. *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984). Furthermore, I am not sure how the defendant could have preserved the issue, since he was not permitted to represent himself and the attorney he wanted to supplant took no exception for him.

[2] The facts in this case, contrary to the majority's assertion, are distinguishable from those in *State v. Carter*, 200 Conn. 607, 513 A.2d 47 (1986). The defendant in *Carter* wanted a different public defender, and it is settled law that a defendant does not have a right to go through a series of lawyers in the middle of trial. The defendant here, however, did not couch his desire to question a witness in terms of his request for a different attorney. Instead, the defendant clearly requested that he be able to finish his case by himself without defense counsel. The court denied his request. In *Carter*, the trial

denial, the court stated that it was aware that the defendant was "angry and disappointed the other day at the turn things took about resting and *my* not permitting you to represent yourself." (Emphasis added.)

Furthermore, the state once conceded the clarity of the self-representation request on appeal. When the state objected to the motion for articulation filed by the defendant's appellate attorney and stated the "specific facts relied upon" in its objection, it conceded that "[t]he defendant . . . orally moved to waive counsel and proceed pro se." In part, on the basis of that concession, this court denied the defendant review of the denial of the motion for articulation. Therefore, I am not persuaded by the state's contradictory contention made at a later time in its appellate brief that the request was equivocal.

I next turn to whether the request was untimely.

After acknowledging that the issue is one of first impression, the state, in effect, urges this court to adopt a rule that a request to waive counsel and to represent oneself is always untimely if made after trial commences. The majority agrees with the state that this waiver was untimely. In contrast, I would interpret the reference in Practice Book § 44-3 to the exercise of the right of self-representation "at any stage of the proceedings, either prior to or following the appointment of counsel," to mean just that, unless there is a specific finding that a defendant has been disruptive or seeks to delay for delay's sake. There was no such finding in the record in this case, nor is there anything in the record which would justify such a finding. Although I recognize that the court necessarily must exercise some

court never recognized that the defendant was exercising his right to self-representation. In contrast here, the court specifically denied the defendant's request after recognizing the defendant's assertion of the right to self-representation.

discretion where the request is made by a person who seeks to delay the trial for the sake of delay or has been tumultuous or disruptive in the courtroom, nothing in the record suggests any of those occurrences.

Our Supreme Court has held that "[t]he right to appear pro se exists to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense. . . . It is also consistent with the ideal of due process as an expression of fundamental fairness. To force a lawyer on a defendant can only lead him to believe that the law contrives against him." (Internal quotation marks omitted.) *State* v. *Brown*, 256 Conn. 291, 302, 772 A.2d 1107, cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001). In *State* v. *Charles*, 56 Conn. App. 722, 726–27, 745 A.2d 842, cert. denied, 252 Conn. 954, 749 A.2d 1203 (2000), this court appreciated the distinction between seeking to substitute one counsel with another and seeking to proceed pro se. In that case, we upheld the trial court's decision to deny substitute counsel midway through trial, but permit the defendant to proceed pro se.

The majority cites *United States* v. *Calabro*, 467 F.2d 973 (2d Cir. 1972), cert. denied sub nom. *Tortorello* v. *United States*, 410 U.S. 926, 93 S. Ct. 1357, 35 L. Ed. 2d 587 (1973), for the proposition that a defendant may not obstruct orderly procedure in the courts. I agree with that necessary conclusion, but note again that nothing in the record shows any unfairness, manipulation or disorder. The defendant's request was not unfair because, as the state noted in its brief, the state in its case-in-chief had called twenty-eight witnesses over the course of two and one-half months of trial. Whether it was prudent or not, there was nothing unfair about the defendant's request to put on his own case and call one or two witnesses of his own after the state had rested. Nor do I see any record evidence that it was manipula-

tive—a defendant has a right to put on his own case and may wait until the state rests to make that decision. Finally, although a defendant's election to call defense witnesses results in additional trial time, that does not constitute disorder. The sixth amendment guarantees the defendant the right to present a complete defense. See *State* v. *Carpenter*, 275 Conn. 785, 850–51, 882 A.2d 604 (2005). I find it instructive that in *Calabro*, although the court would not permit delay in the proceedings while the defendants attempted to find a new attorney, it did permit all of them to exercise the choice of proceeding with the old attorney or proceeding pro se. In offering that option, the federal court recognized the federal constitutional right a defendant has to represent himself.

In the present case, the defendant first attempted to discharge his attorney prior to trial, but the court denied that motion. The defendant then timely asserted his right of self-representation at the end of the state's evidence when it became clear to him that his trial attorney would not call a witness that the defendant wanted to call in his defense. That request should have triggered a hearing pursuant to Practice Book § 44-3.

However, the court conducted no formal inquiry under Practice Book § 44-3 (3) concerning whether the defendant comprehended the nature of the charges and proceedings, the ranges of permissible punishments and any additional facts essential to a broad understanding of the case necessary to establish a waiver of the right to counsel. That failure apparently arose out of the court's view that the defendant had no right to discharge counsel and proceed pro se at the close of the state's case, as expressed in its response to the defendant: "In a word, no."

I agree with the defendant's assertion that Practice Book § 44-3, permitting self-representation at any stage

in the proceedings, is pertinent, not an "exceptional circumstances" test as applied by the court, which may pertain when a defendant, rather than representing himself, desires a new lawyer to replace his current trial attorney.

I would decline to adopt the per se rule urged by the state and would instead give effect to Practice Book § 44-3. Practice Book § 44-3 provides in relevant part: "A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself . . . at any stage of the proceedings, either prior to or following the appointment of counsel. . . ." See also *State* v. *Charles*, supra, 56 Conn. App. 724–25 (defendant permitted to discharge counsel and proceed pro se after two days of trial).

The majority contends that although Practice Book § 44-3 provides that a defendant may represent himself at any stage of the proceedings, it does not provide that he may assert that right at any stage of the proceedings. The judges of the Superior Court, like members of the legislature, are presumed to adopt rules in light of the requirements of our state constitution and to intend a sensible result. Does it make common sense to hold that the right of self-representation ceases once trial begins when a defendant cannot know what might unfold in weeks of trial of the state's case-in-chief? Under the construction of the rule, which the majority urges, the self-representation election must be exercised prior to trial beginning, but not later, unless the trial judge elects to confer that option as a matter of privilege. When construing a rule, as we construe a statute, each phrase and word where possible must be given its meaning. The practical effect of the majority's construction of the phrase, "at any stage of the proceeding," is to diminish, if not actually eliminate, the meaning and significance of the words. Because article first, § 8, of the constitution of Connecticut specifically pro-

vides in relevant part: "In all criminal prosecutions the accused shall have the right to be heard by himself, " I cannot agree with this interpretation.

Our Supreme Court has held that "[b]oth the federal constitution and our state constitution afford a criminal defendant the right to [forgo] the assistance of counsel and to choose instead to represent himself or herself at trial. As a matter of federal constitutional law, the right to self-representation is premised on the structure of the Sixth Amendment, as well as in the English and colonial jurisprudence from which the Amendment emerged. . . . The Connecticut constitution is more explicit, stating directly that [i]n all criminal prosecutions, the accused shall have a right to be heard *by himself* and by counsel . . . . Conn. Const., art. I, § 8. We repeatedly have interpreted this language to establish an independent state constitutional guarantee of the right to self representation." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Day*, 233 Conn. 813, 820, 661 A.2d 539 (1995).

In *Day*, the court went on to state: "We harbor no illusions that a defendant's decision to waive counsel and proceed pro se generally will lead to anything other than disastrous consequences. . . . Nonetheless, the values informing our constitutional structure teach that although [a defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of that respect for the individual which is the lifeblood of the law." (Citation omitted; internal quotation marks omitted.) Id., 821.

Because a fundamental right to self-representation was denied the defendant and no hearing was held to establish whether the waiver of the right to counsel was knowing and voluntary, and no findings were or could be made that there would be resulting inordinate delay, tumult or disorder, I would reverse the defen-

dant's conviction and remand the case for a new trial on the charge of conspiracy to commit assault in the first degree.