### STATE OF CONNECTICUT *v.* RASHAD L. WILLIAMS
### (AC 25515)

Flynn, Harper and Dupont, Js.*

---

*The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued January 4—officially released March 21, 2006

*Sarah F. Summons*, special public defender, for the appellant (defendant).

*Michael E. Criscuolo*, special deputy assistant state's attorney, with whom, on the brief, was *Scott J. Murphy*, state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Rashad L. Williams, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (5) and 53a-48, assault in the first degree in violation of General Statutes §§ 53a-59 (a) (5) and 53a-8 (a), and attempt to commit murder in violation of General Statutes §§ 53a-54a, 53a-49 (a) (2) and 53a-8 (a).[1] The defen-

---

[1] The court imposed a total effective term of thirty years imprisonment.

dant claims that there was insufficient evidence to convict him of any of the charges. We disagree and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 19, 2002, at approximately 4 p.m., Donnell Williams,[2] the victim, drove to Hartford in his Oldsmobile Aurora to pick up Marlon Monts, his first cousin. The two men drove to the house of the victim's girlfriend in New Britain to get supplies to clean his car. They then went to a commercial car wash in New Britain.

The victim drove the car to one of the vacuum cleaners at the car wash. While the victim was cleaning the inside of the vehicle, Monts sat on a curb near the vacuum cleaner and read a newspaper. Around this time, a Cadillac entered the first self-service bay at the car wash. Monts recognized the car as one that he had seen earlier that day when he and the victim were driving through Hartford. Monts recalled that when he saw the Cadillac in Hartford, the defendant was driving the car. When Monts observed the Cadillac at the car wash, the defendant, Norman Moore and one other African-American man were standing around the car. They were not washing or vacuuming the car; one was pacing around, another was sitting on one of the vacuum cleaners and the defendant was standing in the bay. Both Monts and the victim thought it was suspicious that the three men were loitering in the self-service bay of the car wash, but were not washing the car. Nonetheless, the victim and Monts had no interaction with the group of men at that time.

Soon after Monts observed the Cadillac in the first bay, the victim moved his car into one of the other self-service bays to wash his car. The Cadillac left the car

---

[2] Although the defendant and the victim share the same last name, they apparently are not related.

wash at this time. After the victim finished washing his car, he drove it around to the back of the car wash, away from the vacuum cleaners and the self-service bays, to dry his car. Monts sat in the passenger seat listening to music while the victim dried his car and fixed the stereo system that was located in the trunk of his car. Monts and the victim then noticed the three men who had been in the Cadillac earlier walking toward them. Monts got out of the car.

One of the men walked toward the hood of the victim's car, another walked toward the middle of the driver's side and Moore walked toward the trunk area, where the victim was standing.[3] The victim noticed that the man walking toward the middle of the car was wearing a black glove, which stood out as unusual because it was August. As a result, the victim asked Monts to pass him his handgun, which was located next to the console, on the side of the car seat. Immediately after Monts gave the victim the gun, Moore stopped about four feet from the victim. Moore fired a gunshot at the victim, and the victim fired back.

Unsure whether the victim had survived the gunshot, Monts ran through some nearby bushes into a neighborhood adjacent to the car wash and called the police. In the meantime, the men ran back toward the self-service bays, and two of them sped away in the Cadillac. The victim got back in his car and tried to follow the Cadillac in order to obtain the license plate number of the car. He was unable to obtain the license plate number, however, and after realizing that he had been shot in the chest, called the police using a cellular telephone that Monts had left on the car seat. At the direction of the police dispatcher, the victim returned to the car wash to wait for the police to arrive.

---

[3] The victim described this conduct by the three men as "posting up."

Just after 8:30 p.m., Michael Baden, a sergeant with the New Britain police department, and several other officers arrived at the scene. Baden told the other officers to move the crowd that had gathered away from the area and to secure the scene. He then discovered Moore lying on the ground with a gunshot wound to the chest. He was not moving or breathing. The New Britain emergency medical services, which had arrived on the scene immediately after Baden, took Moore to New Britain General Hospital. Moore later died from his injuries.

At the same time, Angel Escobales, an officer with the New Britain police department, discovered the victim in his car in the corner of the car wash parking lot. The victim had a gunshot wound to his left side. He was able to speak to the officers, but he was having difficulty breathing. After being interviewed by Escobales, the victim was taken to Hartford Hospital, where he was treated for his injuries and released.

While surveying the scene, Baden found a bullet hole in the rear driver's side quarter panel of the victim's car. He also found the victim's Smith & Wesson semiautomatic nine millimeter handgun with a cartridge and its magazine between the driver's seat and the center console of the car. As the victim had indicated to the officers, and as they later confirmed, the victim had a state issued pistol permit for the gun.

In addition, Baden found a SigSauer nine millimeter semiautomatic handgun in one of the self-service car wash bays. The state police major crime squad, which assisted in processing the scene, also found several bullet like projectiles and spent cartridge casings. Later testing by James Stephenson, a criminalist with the department of public safety forensic science laboratory, revealed that several of the bullet like projectiles recovered from the scene were in fact bullets and that they

had not been fired from either the Smith & Wesson or SigSauer handguns retrieved from the scene. Stephenson further determined that at least two of these bullet fragments were fired from the same gun.

During the investigation that evening, Cary Carlone, a detective with the New Britain police department, followed up on a report of the license plate number of the Cadillac. Carlone discovered that the car was registered to the defendant. At approximately 2:45 a.m. on August 20, 2002, Carlone located the Cadillac behind a residence in Hartford that belonged to an aunt of the defendant. Although Carlone tried to locate the defendant at that time, the detective was unable to do so.

Later that night, however, Patrick Meehan, a state police trooper, encountered the defendant on the westbound side of Interstate 84 in West Hartford. The defendant was in a Toyota that was parked on the shoulder in the breakdown lane.[4] Although he did not have any identification with him, the defendant gave Meehan his name and his date of birth. Upon reporting the name to the state police dispatcher, Meehan discovered that the defendant was suspected of being involved in the incident at the car wash in New Britain. An officer from the New Britain police department subsequently arrived to take the defendant into custody. Additional facts will be set forth as necessary.

On appeal, the defendant claims that there was insufficient evidence to find him guilty beyond a reasonable doubt of the crimes of which he was convicted. The defendant essentially claims that the circumstantial evi-

[4] Arthur Nelson, the defendant's cousin, testified that on August 19, 2002, he lived at 75 Hartland Street in Hartford, where the defendant's Cadillac was discovered. He testified that the defendant owned two cars at that time, the Cadillac and a Toyota, and that the defendant occasionally parked either the Toyota or the Cadillac in the backyard of this residence. Nelson further testified that on the night in question, he returned home sometime after 10:30 p.m. and that the defendant's Cadillac was parked in his yard.

dence in this case was not sufficient to establish the essential elements of each of the crimes.

The standard of review that applies to all three of the defendant's claims is well settled. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State v. Ledbetter*, 275 Conn. 534, 542, 881 A.2d 290 (2005). "This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . In conducting our review, we are mindful that the finding of facts, the gauging of witness credibility and the choosing among competing inferences are functions within the exclusive province of the jury, and, therefore, we must afford those determinations great deference." (Citation omitted; internal quotation marks omitted.) *State v. Lopez*, 93 Conn. App. 257, 262, 889 A.2d 254, cert. granted on other grounds, 277 Conn. 919, 895 A.2d 791 (2006).

"[T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *State v. Northrop*, 92 Conn. App. 525, 528–29, 885 A.2d 1270 (2005), cert. denied, 277 Conn. 905, 894 A.2d 988 (2006).

"While . . . every element [must be] proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense[s], each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . [I]n determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . [A]n inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference." (Citation omitted; internal quotation marks omitted.) *State* v. *Fagan*, 92 Conn. App. 44, 49, 883 A.2d 8, cert. denied, 276 Conn. 924, 888 A.2d 91 (2005).

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Citation omitted; internal quotation marks omitted.) *State* v. *Liborio A.*, 93 Conn. App. 279, 284, 889 A.2d 821 (2006).

I

The defendant first claims that there was insufficient evidence to convict him of conspiracy to commit assault in the first degree in violation of §§ 53a-48 and 53a-

59 (a) (5). In particular, the defendant claims that his presence at the scene of the crime, standing alone, was insufficient to establish the existence of a conspiracy. We are not persuaded.

We begin by setting forth the elements of the crime of which the defendant was convicted. It is undisputed that, to sustain a conviction under § 53a-48 (a), the state had to establish, beyond a reasonable doubt, that the defendant had agreed with one or more persons to engage in criminal conduct. Specifically, the state had to show not only that the conspirators intended to agree but also that they intended to commit the elements of the offense and that one of them committed an overt act in furtherance of the conspiracy. See *State* v. *Asberry*, 81 Conn. App. 44, 48, 837 A.2d 885, cert. denied, 268 Conn. 904, 845 A.2d 408 (2004). "The existence of a formal agreement between the parties, however, need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act." *State* v. *Goodrum*, 39 Conn. App. 526, 537, 665 A.2d 159, cert. denied, 235 Conn. 929, 667 A.2d 554 (1995). In addition, the state had to prove that the coconspirators (1) intended to cause physical injury to another person, (2) caused such injury to such person or to a third person and (3) did so by means of the discharge of a firearm. General Statutes § 53a-59 (a) (5).

As our Supreme Court has acknowledged, "[b]ecause of the secret nature of conspiracies, a conviction usually is based on circumstantial evidence. . . . Consequently, it is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words we have an agreement. . . . Indeed, a conspiracy can be inferred from the conduct of the accused . . . and his coconspirator, as well as from the circumstances presented as evidence in the case." (Internal quotation marks omitted.) *State* v. *Garner*, 270 Conn. 458, 476–77, 853 A.2d 478 (2004).

"With regard to the essential element of intent, we recognize that conspiracy is a specific intent crime. Intent is divided into two parts: (1) the intent to agree to conspire; and (2) the intent to commit the offense that is the object of the conspiracy. . . . Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . In a conspiracy prosecution, when determining both a defendant's specific intent to agree and his specific intent that the criminal acts be performed, the jury may rely on reasonable inferences from facts in the evidence and may develop a chain of inferences, each link of which may depend for its validity on the validity of the prior link in the chain." (Citation omitted; internal quotation marks omitted.) *State* v. *Oberdick*, 74 Conn. App. 57, 63–64, 810 A.2d 296 (2002). Accordingly, the defendant's state of mind may be proven by his conduct before, during and after the shooting. See *State* v. *McCoy*, 91 Conn. App. 1, 7, 879 A.2d 534, cert. denied, 276 Conn. 904, 884 A.2d 1026 (2005).

Although the state's case against the defendant consisted solely of circumstantial evidence, we conclude that the jury reasonably could have found beyond a reasonable doubt that the defendant was guilty of conspiracy to commit assault in the first degree. There was evidence before the jury that just hours before the shooting at the car wash, Monts saw the defendant driving through Hartford in the Cadillac. Shortly thereafter, the defendant, Moore and a third companion drove into the same car wash in New Britain where Monts and the victim were washing the victim's car. Although the defendant drove his car into one of the self-service bays near the victim and Monts, neither he,

Moore, nor their companion, actually washed the car. Rather, they lingered around the self-service bay while the victim cleaned the inside of his car. When the victim moved his car into one of the other self-service bays, the defendant, Moore and their companion left in the Cadillac.

Once the victim finished washing his car, he drove it to the back corner of the car wash parking lot. No other cars or people were in that part of the parking lot at that time. While the victim was drying his car, he and Monts saw the defendant, Moore and their companion again. This time, the three men were walking toward them in a unified manner, with Moore approaching the trunk, the defendant approaching the front and the third individual approaching the middle of the driver's side of the car. In addition, the third individual was wearing a black glove.

Concerned that something was about to happen, the victim told Monts to give him the handgun that was located inside the victim's car. Immediately after Monts gave the victim his gun, Moore reached the trunk area of the car. Within feet of him, Moore shot the victim, and the victim fired back. Additional gunshots were fired as Monts ran from the scene toward a nearby neighborhood. In fact, the police investigation after the incident identified at least two bullets at the scene that were not fired from either the victim's gun or the second gun found at the scene. A rational trier of fact could infer from this evidence that additional gunshots were fired from at least one additional gun.

Immediately thereafter, the defendant and the third individual fled the scene at a high rate of speed. Hours later, the police discovered the defendant's Cadillac parked in the backyard of his aunt's house in Hartford and, soon after that, Meehan discovered the defendant in his Toyota traveling westbound away from Hartford.

Thus, the evidence, if believed by the jury, was sufficient to establish that, by the time of the shooting, the defendant had seen the victim and Monts twice that day. On the second occasion, the defendant and his companions were watching the victim and Monts. When the defendant arrived for the third time, again with his companions, one of them was wearing a black glove in the middle of the summer. Moreover, when the three men got out of the defendant's Cadillac, they spread out around the victim's car as if to surround the victim and Monts. Moore walked straight toward the victim and shot him at close range. Immediately after gunshots were fired, the defendant sped out of the parking lot. He subsequently tried to conceal the car used during the assault at his aunt's house. Under these facts, we conclude that the state presented evidence sufficient to show, not only that the defendant, Moore and their companion "were knowingly engaged in a mutual plan to do a forbidden act"; (internal quotation marks omitted) *State* v. *Flanagan*, 93 Conn. App. 458, 465, 890 A.2d 123 (2006); as evidenced by their watching the victim and Monts and the manner in which they approached the victim's car immediately before the shooting, but also that they intended to cause physical injury to the victim with a firearm.

II

The defendant next claims that there was insufficient evidence to convict him of assault in the first degree as an accessory in violation of §§ 53a-59 (a) (5) and 53a-8 (a). We disagree.

To convict the defendant of assault in the first degree under § 53a-59 (a) (5), the state must demonstrate with proof beyond a reasonable doubt that the defendant (1) intended to cause physical injury to another person, (2) caused such injury to such person or a third person and (3) did so by means of the discharge of a firearm.

In this case, because the defendant was charged as an accessory, the state did not have to prove that the defendant actually caused physical injury to the victim.

Section 53a-8 (a) provides that "[a] person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender." "Since under our law both principals and accessories are treated as principals . . . if the evidence, taken in the light most favorable to sustaining the verdict, establishes that [the defendant] committed the [crime] charged or did some act which forms . . . a part thereof, or directly or indirectly counseled or procured any persons to commit the offenses or do any act forming a part thereof, then the [conviction] must stand." (Internal quotation marks omitted.) *State* v. *Hines*, 89 Conn. App. 440, 447, 873 A.2d 1042, cert. denied, 275 Conn. 904, 882 A.2d 678 (2005).

Viewed in a light most favorable to sustaining the verdict, the evidence in this case was sufficient for the jury reasonably to find beyond a reasonable doubt that the defendant was guilty of assault in the first degree as an accessory. As already discussed, in the hours preceding the assault, Monts and the victim saw the defendant twice. On the second occasion, he drove his Cadillac into one of the self-service bays near where the victim was cleaning his car. After leaving the car wash for a short time, the defendant returned with Moore and the third individual. The three men walked directly toward the victim and Monts, who were in the back of the car wash parking lot, and they surrounded the car. No one else was around at the time, and the third individual was wearing a black glove, even though it was the middle of August. Immediately thereafter,

Moore shot the victim. Under these facts concerning the defendant's conduct, as well as the conduct of his associates, and the inferences reasonably drawn therefrom, the evidence was sufficient to support the defendant's conviction.

## III

The defendant finally claims that there was insufficient evidence to convict him of attempt to commit murder as an accessory in violation of §§ 53a-54a, 53a-49 (a) (2) and 53a-8 (a). We are not persuaded.

To sustain the conviction of attempt to commit murder, the state must demonstrate with proof beyond a reasonable doubt that, while acting with the kind of mental state required for commission of murder, the defendant (1) intentionally engaged in conduct that would constitute the crime if attendant circumstances were as he believed them to be or (2) intentionally did or omitted to do anything that, under the circumstances as he believed them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. See General Statutes § 53a-49 (a). Section 53a-54a (a) provides in relevant part that "[a] person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ." Because the defendant was charged with being an accessory to attempted murder, the state had to prove only that the defendant, acting with the mental state required for attempted murder, acted with the purpose of assisting another in the commission of the crime. See General Statutes § 53a-8 (a).

As in all cases requiring proof of intent, intent is generally established through circumstantial evidence. *State* v. *Murray*, 254 Conn. 472, 479–80, 757 A.2d 578 (2000). Furthermore, with respect to proving the requisite intent for murder, "[i]ntent to cause death may be inferred from the type of weapon used, the manner in

which it was used, the type of wound inflicted and the events leading to and immediately following the death." (Internal quotation marks omitted.) Id., 480.

The evidence that supported the defendant's conviction for assault in the first degree as an accessory similarly provides sufficient evidence from which the jury could have found beyond a reasonable doubt that the defendant attempted to commit murder as an accessory. We conclude that the cumulative impact of the facts that the defendant, Moore and the third individual parked at the car wash and lingered near the victim and Monts shortly before the shooting; that they returned to the area when the victim and Monts were parked in the back of the parking lot when no one else was in the area; that the defendant, Moore and their companion approached the victim and Monts in a unified manner; that the third individual was wearing a black glove as he approached the victim's car; that Moore shot the victim at close range in the left side of his chest; that the defendant fled the scene and later changed vehicles; and that bullets, which did not match either the victim's gun or the second gun recovered from the scene, later were discovered at the car wash, combined with the reasonable inferences drawn from all of these facts, was sufficient to establish the defendant's guilt of attempt to commit murder as an accessory.

The judgment is affirmed.

In this opinion the other judges concurred.