## STATE OF CONNECTICUT *v.*
## SALVATORE CARACOGLIA
## (AC 25309)

DiPentima, Gruendel and Hennessy, Js.

Argued January 9—officially released April 25, 2006

*Gennaro Bizzarro*, for the appellant (defendant).

*Sarah Hanna*, special deputy assistant state's attorney, with whom, on the brief, were *Timothy J. Liston*, state's attorney, and *George Ferko*, senior assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Salvatore Caracoglia, appeals from the judgment of conviction, rendered after a jury trial, of harassment in the second degree in violation of General Statutes § 53-183 and tampering with a witness in violation of General Statutes § 53a-151. On appeal, the defendant claims that he was denied various constitutional rights because (1) the trial court (a) permitted him to waive the assistance of counsel, (b) admitted unduly prejudicial evidence, (c) failed to dismiss the charges against him, (d) precluded him from presenting testimony from some of his witnesses and (e) ordered him to make a charitable contribution, (2) the prosecutor engaged in a pattern of misconduct and (3) the state presented insufficient evidence to convict the defendant of the crimes with which he was charged. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In 1979, Christine LaRosa and the defendant met as members of the foreign language department of Middletown High School and enjoyed a friendly relationship until the defendant lost his teaching position. LaRosa also had a close relationship with the defendant's children, including his daughter, Tanya Caracoglia.

The charges against the defendant stemmed from the following incident. On June 21 and 22, 1999, LaRosa, a senior class adviser, was chaperoning an all-night postgraduation party. As the party was concluding, Tanya Caracoglia approached LaRosa and struck her in the mouth twice with a closed fist. As a result, LaRosa fell backward and suffered injuries that required immediate and follow-up medical treatment. She gave a sworn statement to the police, and Tanya Caracoglia was arrested and charged in connection with the incident.

The jury reasonably could have found that a hearing related to the charges against Tanya Caracoglia was scheduled to be held on September 14, 1999, and that LaRosa was expected to testify at the hearing. LaRosa did not attend the hearing, however, because she had received a threatening telephone call from an anonymous caller on September 11, 1999.[1] According to LaRosa, the caller was angry, threatening and evil. LaRosa recognized the caller as the defendant due to his distinctive accent. After consulting with her attorney, LaRosa reported the threatening call to the police. In January, 2000, the defendant was arrested and charged with harassment in the second degree and tampering with a witness. Following a trial at which the defendant represented himself, the jury found him guilty of both charges.

The court, *Holzberg, J.*, sentenced the defendant to two years imprisonment, execution suspended after 120 days, and three years of probation on the conviction of tampering with a witness and an unconditional discharge on the conviction of harassment in the second degree.[2] The court also imposed special conditions of probation. As a sanction for violating its orders during trial, the court ordered the defendant to make a $500 charitable contribution approved by the office of adult probation.

I

The defendant's first claim is that the court, *O'Keefe, J.*, denied him the constitutional right to the assistance of counsel by granting his request to represent himself at trial. The defendant claims that (1) he was not compe-

---

[1] The caller stated to LaRosa: "Hello. You fucking bitch. If anything happens to my daughter this week, I'll fucking kill you." The caller then hung up.

[2] The court stayed the execution of the defendant's sentence until June 1, 2004, to permit the defendant to provide financial support for his daughter as she completed her final semester of college.

tent to waive his right to counsel and (2) his waiver was not made knowingly, intelligently and voluntarily. The defendant failed to preserve his claim at trial and seeks to prevail on appeal pursuant to the plain error doctrine;[3] Practice Book § 60-5; or *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We will review the claim because the record is adequate for our review, and the claim is of constitutional magnitude, but the defendant cannot prevail because the constitutional violation clearly did not exist, and he was not clearly denied the right to a fair trial.

The following pretrial history is relevant to the defendant's claim. During a pretrial proceeding before the court, *Clifford, J.*, the defendant insulted the court with a vulgar verbal outburst. After the defendant apologized to the court, his court-appointed counsel, Raul Davila-Carlos, requested permission to speak with the court at the bench. Following the bench conference, Judge Clifford ordered the defendant to undergo a competency examination pursuant to General Statutes § 54-56d.[4]

[3] Plain error is reserved for those truly extraordinary circumstances where public confidence in the judicial system will be eroded if the defendant fails to obtain relief. See *State* v. *Smith*, 275 Conn. 205, 239–40, 881 A.2d 160 (2005). The defendant's claim does not encompass such a circumstance.

[4] General Statutes § 54-56d provides in relevant part: "(a) Competency required. Definition. A defendant shall not be tried, convicted or sentenced while he is not competent. For the purposes of this section, a defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense.

"(b) Presumption of competency. A defendant is presumed to be competent. The burden of proving that the defendant is not competent by a preponderance of the evidence and the burden of going forward with the evidence are on the party raising the issue. The burden of going forward with the evidence shall be on the state if the court raises the issue. . . .

"(c) Request for examination. If at any time during a criminal proceeding it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency. . . ."

A competency hearing was held before the court, *Gilardi, J.*, on December 6, 2000. At that time, the defendant asserted through counsel, Daniel Dilzer, that he was competent to stand trial. On the basis of expert testimony, Judge Gilardi found that the defendant was not competent to stand trial, but that he was capable of being restored to competency after a period of treatment not to exceed sixty days. The defendant was committed to Connecticut Valley Hospital.

A second competency hearing was scheduled for February 6, 2001. The defendant waived the right to a hearing on the basis of his opinion that he was competent to stand trial. A report prepared by experts at Connecticut Valley Hospital concluded that the defendant had been restored to competency. On the basis of the report, Judge Clifford found the defendant competent to stand trial.

On January 11, 2002, Davila-Carlos filed a motion to withdraw his appearance. The court, *B. Fischer, J.*, granted the motion to withdraw and ordered that a new public defender be appointed to represent the defendant. The defendant was granted several postponements, at his request, in order to secure private counsel. The defendant, however, was unable to retain private counsel, and on May 13, 2002, he asked the court to appoint counsel for him. Judge Clifford appointed Keith DuBay as a special public defender on May 28, 2002.

On October 28, 2003, the defendant asked that DuBay be removed as his counsel, claiming that DuBay's assistance was ineffective, and requested permission to proceed pro se with the assistance of standby counsel other than DuBay. DuBay represented to Judge O'Keefe his understanding of the defendant's dissatisfaction with his representation, i.e., trial strategy. The court addressed the defendant extensively to explain the dif-

ferences between pretrial and trial proceedings.[5] Before ruling on the defendant's motion to represent himself,

[5] The following colloquy transpired during the hearing on the motion to remove DuBay as counsel:

"The Court: Now, as an attorney, [Mr. DuBay], I know you want your client to get the best representation possible, and you have confidence in your abilities and I do, too. I know you. If we were sitting around debating what might be best for [the defendant], you and I might agree that his rights would be best protected if you were his lawyer, but it's his choice. So, you know, it's not—we're not in a position to substitute our judgment for his, and he wants to call the shots now.

"I might accept that [Mr. Caracoglia], but there's something you've got to understand. When you get on trial and you're your own attorney, you have to accept the rulings of the court. When a judge makes a ruling, that's it. You move on to the next issue. Can you do that?

"[The Defendant]: If it's reasonable, because I would like to see the judge impartial.

"The Court: Yes. It's not going to be me.

"[The Defendant]: Well, no, no, no.

"The Court: Here's the point I'm trying to get across. Here in court with no jury and no people taking time away from their everyday pursuits, and this is my job to be here and talk about these issues, and we have always been able to talk about the cases, but there are more rules. It's a little bit different situation at trial, and you're going to have to go by the rules. And when a judge makes a decision, you got to live with it. You can make a record, and somebody will look at what the judge did to see if he did the right thing. . . . Hold on. Hold on. See, this is an example. You can't interrupt when you get into trial. I mean, I let you interrupt because it doesn't bother me. But when you get into the trial, you don't like a judge's ruling, it's not open to debate. You got to just accept it and move on. Can you do that, even though you think the judge is making a mistake?

"[The Defendant]: I might.

"The Court: Okay. Well, let me tell you in advance that judges in a trial, and I don't know who the judge is going to be, but in general, the judges take their supervisory role a lot more seriously. And if they start to have problems with you, you can end up in a lot of trouble with the judge. It's not as free flowing and as give and take as you might have experienced with me here in court where I let you interrupt and I interrupt you and I call you Sal.

"It's not going to be like that because there's going to be civilians involved, the jury and the judge; he's there to make sure that time is not wasted and that things go according to the rules. So, it's going to be a lot different, and you're going to have to accept the rulings of the judge.

"To give you an example. You want certain people subpoenaed in. I don't know if I'll rule on that. I won't rule on that. If the judge says eight out of ten of those people aren't going to come in, that's it. Those people are not going to be subpoenaed, and you're going to have to move on. Now, can you accept that?

the court instructed and canvassed the defendant at length.[6] At the conclusion of the extensive canvass, the

"[The Defendant]: Yes.

"The Court: That's the way it's going to be.

"[The Defendant]: Yes, I can accept that. No problem."

[6] "The Court: You have the right to an attorney. You want to represent yourself just with Mr. DuBay as an adviser. I believe it's your right to do that. Before I let you do that, I have to make sure that you know what you're doing and that your decision is an intelligent one. Okay? So, that's the purpose of these questions. You understand that?

"[The Defendant]: Okay.

"The Court: Now, today, you're fine. You're not taking any medicine. You haven't had anything to drink. You're fine.

"[The Defendant]: The only thing that I drink, judge, is coffee.

"The Court: Okay. But these are routine questions that I ask everyone when they're giving up an important constitutional right. Okay?

"[The Defendant]: Okay.

"The Court: So, they're not based on anything I've seen in court today. You seem fine to me. So, everything's okay with you today, right?

"[The Defendant]: Correct, sir.

"The Court: And you had enough time to think about this decision that you're making to represent yourself, correct?

"[The Defendant]: Correct.

"The Court: And you've been represented by counsel for a long time, and you've had numerous discussions with him about the issues in the case and you disagree on trial strategy, correct?

"[The Defendant]: Correct.

"The Court: All right. And this is not a [Corrupt Organizations and Racketeering Activity Act; General Statutes § 53-393 et seq.; or a Racketeer Influenced and Corrupt Organizations Act; 18 U.S.C. § 1961 et seq.] prosecution here; we're talking about two misdemeanor counts, right?

"[The Prosecutor]: Harassment. I think, I thought I was going to add a tampering with a witness, but maybe I never—it is on there. So, there's a felony charge, too.

"The Court: You don't see the case as a complicated case, do you?

"[The Defendant]: No.

"The Court: Okay. I don't either. Now, your decision is to take this to a jury. You still want to stay with that?

"[The Defendant]: Correct.

"The Court: Okay. And you understand at a trial, you'll be representing yourself. You'll be speaking on your behalf, but you don't have to testify. You understand?

"[The Defendant]: Yes, Your Honor.

"The Court: Yes. And I know you're a high school grad[uate], but I just need a record of that. College grad[uate], too?

"[The Defendant]: Yes.

court found that the defendant's waiver of his right to be represented by counsel at trial was voluntary and understandingly made and that DuBay would continue to advise the defendant as standby counsel.

We review the defendant's claim pursuant to the following standard. "[T]he determination of whether there

"The Court: Former teacher at a local high school, correct?

"[The Defendant]: Master's degree, too. . . .

"The Court: A master's degree in language?

"[The Defendant]: Language.

"The Court: Okay. And you think you'll be capable of asking the witnesses questions, conducting cross-examination?

"[The Defendant]: Correct.

"The Court: You have a theory of your own defense, what you want to do, whether you want to testify, what witnesses you want?

"[The Defendant]: Correct.

"The Court: You'll go by the rulings of the court?

"[The Defendant]: Yes.

"The Court: Even ones you don't agree with?

"[The Defendant]: Correct.

"The Court: All right. And you'll follow directions from the bench? The judge tells you this is the way it's got to be done. If you don't agree, just make a record of your disagreement and go on. Then your rights will be preserved. You understand that, right?

"[The Defendant]: Okay.

"The Court: Okay. On technical points, you should consult with Mr. DuBay, and you'll do that?

"[The Defendant]: Correct.

"The Court: Possibly not on trial strategy, but on questions of . . . .

"[The Defendant]: Procedures of court.

"The Court: Yes. Okay. You know generally that objective observers believe that this is not the wisest thing to do. In other words, if there was a poll and the question was, 'do you think it is a good thing to represent yourself in a trial,' most people would disagree?

"[The Defendant]: You are probably right.

"The Court: Yes. Okay. And you know during the course of the trial that you'll be opposed by an attorney and that your lack of experience in a trial may hurt you?

"[The Defendant]: I understand that.

"The Court: But you're willing to do that because . . . for whatever reason. . . .

"[The Defendant]: I know that [the prosecutor] is a very experienced lawyer. He knows all the little details, how to play tricks and everything else. . . . I understand he's got to do his job. But one thing is, I know I am on the disadvantage[d] side, but hopefully the truth will prevail. That's all I'm hoping for."

has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. . . . This important decision rests within the discretion of the trial judge." (Internal quotation marks omitted.) *State* v. *Rose*, 73 Conn. App. 702, 706, 809 A.2d 534, cert. denied, 262 Conn. 927, 814 A.2d 382 (2002). Our inquiry, therefore, is to determine whether the court abused its discretion in denying the defendant's request to discharge his counsel and to proceed pro se.

"It is settled law that [b]oth the federal constitution and our state constitution afford a criminal defendant the right to [forgo] the assistance of counsel and to choose instead to represent himself or herself at trial. As a matter of federal constitutional law, the right to self-representation is premised on the structure of the Sixth Amendment, as well as in the English and colonial jurisprudence from which the Amendment emerged. . . . The Connecticut constitution is more explicit, stating directly that [i]n all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . .

"Although it may be settled law that a criminal defendant has an absolute right to self-representation, that right is not self-executing. A trial court in this state must satisfy itself that several criteria have been met before a criminal defendant properly may be allowed to waive counsel and proceed pro se. . . . Those criteria include a determination by the court (1) that the defendant is competent to waive counsel, and (2) that his waiver is knowing, intelligent and voluntary." (Citation omitted; internal quotation marks omitted.) Id., 706–707. The defendant claims that the court abused its discretion with respect to both prongs of the waiver test.

In this case, defended under the theory that LaRosa's complaint was one in a series of accusations that she had made, which were intended to ruin the defendant's reputation,[7] we bear in mind the following quotation. "Our Supreme Court has held that [t]he right to appear pro se exists to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense. . . . It is also consistent with the ideal of due process as an expression of fundamental fairness. *To force a lawyer on a defendant can only lead him to believe that the law contrives against him.*" (Emphasis added; internal quotation marks omitted.) *State v. Flanagan*, 93 Conn. App. 458, 482, 890 A.2d 123 (2006) (*Flynn, J.*, dissenting); see also *McKaskle v. Wiggins*, 465 U.S. 168, 176–77, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984); *Faretta v. California*, 422 U.S. 806, 834, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

## A

### Competent to Waive Assistance of Counsel

The defendant's first claim is that Judge O'Keefe improperly granted his request to represent himself because the defendant was unable to consult counsel with a reasonable degree of rational understanding of the proceedings against him. The defendant merely

---

[7] The defendant requested that subpoenas be issued to as many as fifty people. Before permitting the defendant to examine the witnesses he had called, Judge Holzberg held a preliminary hearing during which the defendant proffered the testimony of each of his witnesses. The proffered testimony concerned irrelevant events that had occurred as much as fifteen years prior to September, 1999. In essence, it appears that the defendant was attempting to demonstrate that LaRosa falsely had accused him of wrongdoing that resulted in his losing his employment at Middletown High School. Throughout the preliminary hearing, the court guided and instructed the defendant as to which questions were permissible, crafted the form of questions and tightly controlled his inquiry to protect the potential witnesses. The court also warned the defendant repeatedly that certain testimony was irrelevant and would open the door to significant prejudicial cross-examination.

argues, however, that because he was found incompetent to stand trial at one stage of the proceedings, the court should have known that he was incompetent to represent himself.[8] We disagree with the defendant's claim.

"A defendant is deemed competent to waive counsel when it is shown that he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." (Internal quotation marks omitted.) *State* v. *Rose*, supra, 73 Conn. App. 707. "[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself. In *Faretta* v. *California*, [supra, 422 U.S. 806], we held that a defendant choosing self-representation must do so 'competently and intelligently,' . . . but we made it clear that the defendant's 'technical legal knowledge' is 'not relevant' to the determination whether he is competent to waive his right to counsel . . . and we emphasized that although the defendant 'may conduct his own defense ultimately to his own detriment, his choice must be honored,' . . . . Thus, while '[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts,' . . . a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation." (Citations omitted; emphasis in original.) *Godinez* v. *Moran*, 509 U.S. 389, 399–400, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993).

"It is undisputed that an accused who is competent to stand trial also is competent to waive constitutional

---

[8] If the defendant's claim is that during the course of trial, he was unable to consult counsel with a reasonable degree of rational understanding of the proceedings against him, he has not briefed that claim, and we will not address it.

rights." *State* v. *Ouellette*, 271 Conn. 740, 752–53, 859 A.2d 907 (2004). Pursuant to *Godinez*, "the same standard used to determine competency to stand trial also applies to determine competency to plead guilty or to waive the right to counsel. The decision is grounded in two posited equivalencies: (1) that the decision to plead guilty is equivalent to the sum total of decisions a defendant would be required to make at trial; and (2) that the competency required to waive the right to counsel is equivalent to the competency required to waive other constitutional rights incident to a guilty plea. . . . The result of the transitive analysis employed by the [United States Supreme Court] is that any criminal defendant who has been found competent to stand trial, ipso facto, is competent to waive the right to counsel as a matter of federal constitutional law." (Citations omitted.) *State* v. *Day*, 233 Conn. 813, 823–24, 661 A.2d 539 (1995).

As in *Day*, the defendant here never claimed that he was incompetent to stand trial before, during or after the proceeding before Judge O'Keefe on his request to represent himself. The record discloses that during the competency proceedings, first before Judge Gilardi and then before Judge Clifford, the defendant argued that he was competent to stand trial.[9] Furthermore, the defendant never has claimed that Judge Clifford's finding that he had been restored to competency was in error. On appeal, the defendant merely claims that because he was found incompetent to stand trial at one stage of the proceedings, but subsequently found competent to stand trial at another stage, Judge O'Keefe should have known that he was incompetent to represent himself.

[9] This court has often stated that "[a] defendant cannot change his strategy on appeal. . . . [A] party may not pursue one course of action at trial and for tactical reasons and later on appeal argue that the path he rejected should now be open to him." (Internal quotation marks omitted.) *State* v. *Davis*, 76 Conn. App. 653, 662, 820 A.2d 1122 (2003).

"The provisions of § 54-56d state that if it appears that the defendant is not competent, and if the trial court finds that a request for a competency evaluation is justified, the court must order a competency examination. We have interpreted this standard as requiring a competency evaluation any time a reasonable doubt is raised regarding the defendant's competency. . . . To establish such reasonable doubt, the defendant must present substantial evidence, not merely allegations, that he is incompetent." (Citation omitted; internal quotation marks omitted.) *State* v. *Ross*, 269 Conn. 213, 272, 849 A.2d 648 (2004). "Evidence is substantial if it raises a reasonable doubt about the defendant's competency . . . ." (Internal quotation marks omitted.) Id. "[A] defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense." General Statutes § 54-56d (a).

Neither in the trial court nor on appeal has the defendant presented any evidence, let alone substantial evidence, that he was unable to understand the nature of the proceedings against him at the time the court granted his request to represent himself. He addressed the court civilly, and his responses were coherent. His claim that he lacked the ability to consult with his standby counsel with a reasonable degree of rational understanding is belied by his response to the court when it was instructing him when to consult with counsel. The defendant himself supplied the information. The defendant did not need to consult counsel about strategy but on "[p]rocedures of court." See footnote 6. The defendant also responded affirmatively when asked if he had a theory of the case, if he understood that he did not have to testify and if he could abide by the court's rulings. Id. The defendant understood that he was going to be opposed by a competent attorney. Most tellingly, when the court told him that objective observers think it is not wise for a person to represent

himself, the defendant responded, "You are probably right." Id.

Our analysis of the defendant's claim is similar to that of our Supreme Court in *State* v. *Wolff*, 237 Conn. 633, 678 A.2d 1369 (1996) (defendant claimed court aware of prior psychiatric history and crimes he was accused of involved irrational behavior). "The competence that is required for a defendant's waiver of counsel to be valid is not . . . the competence to *represent himself*, but is, rather, the competence to *waive the right* to counsel. . . . Thus, while it is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts . . . a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 667. Although the defendant may have interrupted the court when it canvassed him, he gave rational and coherent responses to the court's questions. See id., 665. Over a period of years subsequent to his rehabilitation, the defendant appeared before a number of judges, worked with counsel, and interacted with the prosecutor and others in the criminal justice system. No one suggested that he again had become incompetent to stand trial.

On the basis of the record and the defendant's failure to question his competency to stand trial or to refer to substantial evidence that he did not understand the nature of the proceedings against him, we conclude that he was competent to waive his right to the assistance of counsel and that the court did not abuse its discretion in granting his motion to represent himself.

B

Knowing, Intelligent and Voluntary Waiver

The defendant claims that his waiver of the right to be represented by counsel was not knowingly and

intelligently made because he "did not comprehend the essence of the case against him." We are not persuaded.

"[Practice Book § 44-3] was adopted in order to implement the right of a defendant in a criminal case to act as his own attorney . . . . Before a trial court may accept a defendant's waiver of counsel, it must conduct an inquiry in accordance with [Practice Book § 44-3], in order to satisfy itself that the defendant's decision to waive counsel is knowingly and intelligently made. . . . Although it may be settled that a criminal defendant has an absolute right to self-representation, that right is not self-executing. . . . Claims concerning a violation of Practice Book § 44-3 frequently occur in the context of a claim that the court improperly permitted the defendant to represent himself." (Citations omitted; internal quotation marks omitted.) *State* v. *Flanagan*, supra, 93 Conn. App. 472.[10]

"The right to counsel and the right to self-representation present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in each, but since the two rights cannot be exercised simultaneously, a defendant must choose between them. When the right to have competent counsel ceases as a result of a sufficient waiver, the right of self-representation begins. . . . Put another way, a defendant

---

[10] Practice Book § 44-3 provides: "A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself or herself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

"(3) *Comprehends the nature of the charges* and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self-representation." (Emphasis added.)

properly exercises his right to self-representation by knowingly and intelligently waiving his right to representation by counsel. . . . When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must knowingly and intelligently [forgo] those relinquished benefits. . . . The state bears the burden of demonstrating that the defendant knowingly and intelligently waived his right to counsel." (Citations omitted; internal quotation marks omitted.) *State* v. *Diaz*, 274 Conn. 818, 828–29, 878 A.2d 1078 (2005).

"[A] defendant need not . . . have the skill and experience of a lawyer in order competently and intelligently to choose self-representation . . . . Rather, a record that affirmatively shows that [he] was literate, competent, and understanding, and that he was voluntarily exercising his informed free will sufficiently supports a waiver. . . . The nature of the inquiry that must be conducted to substantiate an effective waiver has been explicitly articulated in decisions by various federal courts of appeals. See, e.g., *United States* v. *Cash*, 47 F.3d 1083, 1088 (11th Cir. 1995) (court must inform defendant of charges, included offenses and possible range of punishment); *United States* v. *Hurtado*, 47 F.3d 577, 583 [2d Cir.] (factors determining valid waiver include whether defendant understood that he had choice between proceeding pro se and with assigned counsel, understood advantages of having trained counsel, and had capacity to make intelligent choice) [cert. denied, 516 U.S. 903, 116 S. Ct. 266, 133 L. Ed. 2d 188 (1995)]; *United States* v. *Van Krieken*, 39 F.3d 227, 229 (9th Cir. 1994) (defendant must be aware of nature of charges against him, possible penalties and disadvantages of self-representation); *Government of Virgin Islands* v. *James*, 934 F.2d 468, 471 (3d Cir. 1991)

(waiver must be made with apprehension of nature of charges, statutory offenses included within them, range of allowable punishments thereunder, possible defenses to charges, circumstances in mitigation thereof, and all other facts essential to broad understanding of whole matter); *United States* v. *Silkwood*, 893 F.2d 245, 249 (10th Cir. 1989) (same) [cert. denied, 496 U.S. 908, 110 S. Ct. 2593, 110 L. Ed. 2d 274 (1990)]; *United States* v. *McDowell*, 814 F.2d 245, 251 [6th Cir.] (model inquiry includes questioning about defendant's legal background, knowledge of crimes charged, possible punishments, familiarity with Federal Rules of Evidence and Criminal Procedure, procedure for testifying and advice that defendant would be better served by representation by trained attorney) [cert. denied, 484 U.S. 980, 108 S. Ct. 478, 98 L. Ed. 2d 781 (1987)]. . . .

"The defendant, however, does not possess a constitutional right to a specifically formulated canvass [with respect to this inquiry]. His constitutional right is not violated as long as the court's canvass, whatever its form, is sufficient to establish that the defendant's waiver was voluntary and knowing. . . . In other words, the court may accept a waiver of the right to counsel without specifically questioning a defendant on each of the factors listed in Practice Book § [44-3] if the record is sufficient to establish that the waiver is voluntary and knowing." (Citation omitted; internal quotation marks omitted.) *State* v. *Diaz*, supra, 274 Conn. 829–31.

The defendant's claim in his appeal is that his waiver of the right to counsel was not knowingly and intelligently made because he did not comprehend the *essence* of the case against him. The word essence is not used in Practice Book § 44-3, and the defendant has not explained what that word means in the context of his claim or provided any authority to support his claim.[11]

---

[11] Because the defendant's claim is unclear, it is not adequately briefed.

We assume that the defendant's claim falls within Practice Book § 44-3 (3), concerning his comprehension of the nature of the charges against him. The transcript reveals that Judge O'Keefe canvassed the defendant as to his comprehension of the case against him. See footnote 6.

During the court's canvass, the defendant was asked, "And you've been represented by counsel for a long time, and you've had numerous discussions with him about the issues in the case and you disagree on trial strategy, correct?" The defendant responded that the court's statement was correct. "In general, a trial court may appropriately presume that defense counsel has explained the nature of the offense in sufficient detail. . . . Furthermore, the defendant need not be specifically informed of the particular elements of the crimes charged before being permitted to waive counsel and proceed pro se. In fact . . . perfect comprehension of each element of a criminal charge does not appear to be necessary to a finding of a knowing and intelligent waiver." (Citation omitted; internal quotation marks omitted.) *State* v. *Bangulescu*, 80 Conn. App. 26, 45, 832 A.2d 1187, cert. denied, 267 Conn. 907, 840 A.2d 1171 (2003). The defendant also stated that he did not think this was a complicated case. The defendant responded affirmatively that he had a theory of the case and that he knew which witnesses he wanted to call.

The substance of the charges against the defendant was that he had made a threatening telephone call to LaRosa that caused her to absent herself from the hearing for Tanya Caracoglia. The theory of defense was that LaRosa previously had accused him falsely. If the defendant's theory were true and evidence to that end properly presented, he very well may have prevailed at trial. The defendant subpoenaed a large number of witnesses to testify about LaRosa's prior accusations against him. In proffering the evidence, however, the

defendant did not limit the scope of his examination, and therein lay his downfall. He sought to present irrelevant evidence, to conduct trials within a trial, so to speak. The problem the defendant encountered was not his failure to comprehend the nature of the claims against him but his lack of technical skill to defend against those claims.

"We harbor no illusions that a defendant's decision to waive counsel and proceed pro se generally will lead to anything other than disastrous consequences. . . . Nonetheless, the values informing our constitutional structure teach that although [a defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of that respect for the individual which is the lifeblood of the law." (Citation omitted; internal quotation marks omitted.) *State* v. *Day*, supra, 233 Conn. 821. In granting the defendant's motion to proceed pro se, the court honored this fundamental precept of our law.

Practice Book § 44-3 protects a defendant from waiving the right to counsel when he does not understand the nature of the charges against him and their consequences. Section 44-3 does not, however, protect a defendant from his poor judgment in failing to heed the court's warning that representing oneself is something most people consider a bad idea. The defendant himself agreed with that conventional wisdom but declined to follow it. We therefore conclude that the defendant comprehended the nature of the claims against him and knowingly and voluntarily waived his right to counsel.

II

The defendant's second claim is that the court, *Holzberg, J.*, improperly admitted misconduct evidence of a highly inflammatory nature that was more prejudicial

than probative.[12] We decline to review this claim because the defendant induced the error.

The following facts are relevant to the claim. As we stated in footnote 7, prior to the defendant's examining the witnesses whom he had subpoenaed before the jury, the court conducted a preliminary hearing on the substance of the defendant's direct examination and the proffered testimony to determine whether it was admissible. The purpose of the proffered evidence was to demonstrate that LaRosa was biased against the defendant and had accused him falsely in the past.

One of the subpoenaed witnesses was Stefan Ozga, a teachers' union representative and former friend of the defendant. Outside the presence of the jury, the defendant asked Ozga whether he, while attending a particular meeting, had heard LaRosa make statements concerning threats from the defendant. Ozga answered that he had not. The defendant then asked Ozga why he had given school officials a statement regarding such

---

[12] "[A]s a general rule, evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the crime of which he is accused. . . . Nor can such evidence be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . Evidence of prior misconduct may be admitted, however, when the evidence is offered for a purpose other than to prove the defendant's bad character or criminal tendencies. . . . Exceptions to the general rule precluding the use of prior misconduct evidence have been recognized in cases in which the evidence is offered to prove, among other things, intent, identity, motive, malice or a common plan or scheme. . . .

"In order to determine whether such evidence is admissible, we use a two part test. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of [the prior misconduct] evidence must outweigh [its] prejudicial effect . . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 659–61, 835 A.2d 895 (2003).

threats if he never had heard LaRosa discuss the threats. Ozga answered, "Because, Sal, in my presence, you've threatened [LaRosa] numerous times that you were going to kill her."

The court terminated the defendant's further inquiry because it concerned irrelevant matters. The court asked the defendant if he wanted to call Ozga as a witness at trial. The defendant responded in the affirmative, whereupon the prosecutor interjected: "He should be aware that he is opening up some doors that could hurt him." The court stated: "I know. I am going to advise [the defendant] that you have heard some of the questions that Mr. Ozga has responded to, including prior threats. So, you're representing yourself. It is your decision. I am not your lawyer." The defendant said it was his decision to call Ozga.

Shortly thereafter, the court again warned the defendant of the dangers inherent in Ozga's testimony: "Stefan Ozga is coming back at your request. I am going to advise you, again . . . I believe you . . . embark on a very perilous course if you call Mr. Ozga back because you will open the door to the possible admission of prior threats to [LaRosa]. So, I suggest you think long and hard about whether it is an intelligent strategy for you to call Mr. Ozga back, given what he will testify." The defendant replied that Ozga "will be back."

After the luncheon recess, the court addressed the defendant and the prosecutor again with regard to Ozga's testimony. The court summarized Ozga's testimony concerning the threats he had heard the defendant make and reiterated the warning to the defendant. The court then said that it would advise Ozga that he was not to volunteer information about the threats he had heard the defendant make.[13] The prosecutor

---

[13] Prior to Ozga's testifying in front of the jury, the court instructed him as follows: "Now, Mr. Ozga, yesterday, in a preliminary hearing, you made reference, I believe, to some threats that [the defendant] may have previously made with respect to [LaRosa], and I am directing you not to blurt any of

informed the court that he would not cross-examine Ozga about threats he had heard the defendant make unless the defendant opened the door to such an inquiry. The court ordered the prosecutor to advise it outside the presence of the jury if he intended to conduct such an inquiry so that the court could evaluate whether the testimony's probative value outweighed its prejudicial effect.

The defendant examined Ozga in front of the jury, focusing on a statement Ozga had provided to school officials. Ozga testified that LaRosa did not tell him that the defendant was going to kill her. The defendant's examination of Ozga continued, in part:

"[The Defendant]: Okay. Mr. Ozga, did you or did [a school official] tell you that I . . . was going to kill [LaRosa]?

"[The Witness]: No. The situation wasn't that way. . . . I told her that because you were upset about what had happened with the suspension, with the accusation, the allegations that were made. I told her, okay, you know how Sal is. Be careful. Before I know it, [a school official] calls me for a statement. He said that [LaRosa] went to him and said that I had overheard X, Y and Z, and he wanted a statement from . . . me, and that's the statement I gave.

\* \* \*

"[The Defendant]: And, at this point in time, you're called by [the school official] to give a statement, and the statement you gave, actually, is that at no way that you ever heard [the defendant] making physical threat[s] about [LaRosa]. . . . [The defendant's] intent

that out. [The prosecutor] may wish to ask you about that during cross-examination, but you are not to blurt that out voluntarily. Okay?" Ozga agreed and abided by the instruction during his testimony.

was to embarrass [LaRosa] politically, professionally and personally?

"[The Witness]: Well, the statement, also says, 'I am going to get [LaRosa],' and there was all sorts of conversations about what 'I'm going to get [LaRosa]' means.

\* \* \*

"[The Defendant]: Can you clarify for the court and for the jury here what was meant by *get*?

"[The Witness]: . . . I don't know what . . . you meant by *get*. Okay. I was downplaying any kind of threats, and you were talking about, 'I'm going to politically embarrass her. I'm going to politically do this to her. I'm going to personally embarrass her. . . .'

"[The Defendant]: All right. But there was no way that I threatened to kill her. It was in her mind. That's what you said here in your statement—that we had a discussion about [the defendant's] threats together. We talked about it, what *get* her means. And I told [the school official] that [the defendant] intended to embarrass—to embarrass politically, professionally and personally. So, that's what we mean by *get*.

"[The Witness]: That's what I told [the school official]." (Emphasis added.)

Soon thereafter, the court concluded the defendant's examination of Ozga, and the prosecutor asked to be heard outside the presence of the jury. He argued that although the defendant had been advised of the risks associated with posing certain questions to Ozga, the defendant had opened the door permitting the state to ask Ozga to clarify what he knew about threats the defendant had made to LaRosa. The court asked the state for a proffer of the evidence. The questions posed by the state to Ozga were whether the defendant ever threatened LaRosa in his presence, how many times

and the nature of the threats. Ozga responded that the defendant said that he was going to kill her, and that she had ruined his life and his family. The court asked Ozga whether the defendant's words were threats or statements. Ozga responded: "Over the years, until, Your Honor, [the defendant] assaulted me. It was [the defendant]. You know how [the defendant] is. He gets hot under the collar. He's a loose cannon. It never materialized into anything. Okay. But he was getting progressively worse at it."

The court asked the state to explain the relevance of its questioning. The prosecutor argued that the defendant had opened the door to past threats and that the defendant's language demonstrated a common scheme. The state anticipated that the defendant would argue to the jury that if he never made prior threats, the threat alleged in the charges here had not occurred. The court explained that it had to consider whether the line of inquiry was more prejudicial than probative. The court did not want to cause a mistrial or cause reversible error. The court reserved judgment until after the luncheon recess. After the recess, the court continued to query Ozga about the nature, time and intensity of the defendant's threats to everyone involved with the issue of the defendant's employment. The court initially ruled that the admission of the evidence would create reversible error. The defendant objected to the admission of the evidence, as well. The prosecutor then suggested, as an alternative to the proposed cross-examination, that some portions of Ozga's testimony be stricken because it could be construed by the jury that the defendant never had threatened LaRosa with bodily injury but with political retaliation. The defendant opposed the striking of that portion of Ozga's testimony because it proved his point. The defendant stated that he never threatened to kill LaRosa, he just wanted to embarrass her publicly. The following colloquy transpired:

"The Court: Let me ask you. Is it your claim—is it going to be your argument to the jury that . . . LaRosa . . . has . . . made unfounded threats, has reported unfounded threats?

"[The Defendant]: All the time, Your Honor.

"The Court: Okay. Then, I am going to allow this testimony. It's relevant. . . . If that's going to be your theory, then, the state can rebut that—that there have been other occasions in which there have been different types of threats. . . . Now, I just want to make sure . . . when you argue to the jury tomorrow, [it] is that . . . LaRosa on previous occasions has made inaccurate or misleading or false threats that you were going to harm her?

"[The Defendant]: Correct, Your Honor.

"The Court: And this is just one in a series of such false threats?

"[The Defendant]: Yes, Your Honor.

"The Court: Okay. Well, then, under those circumstances, it seems to me it's relevant for the state to address the claim by hearing from Mr. Ozga as to the nature of the threats, and we'll let the jury decide. . . . Again, I think you've opened up a Pandora's box that you may regret, but having opened it, the state is fairly entitled to respond."

On cross-examination, the state asked Ozga whether he personally knew of threats the defendant had made to LaRosa. Ozga responded that the defendant had threatened LaRosa on numerous occasions. On redirect examination, the defendant asked Ozga for specific dates that such threats were made. Ozga responded that there were so many he could not recall. He also testified, in response to questions from the defendant,

that over time, the defendant became more threatening, animated and hostile.

The defendant also recalled LaRosa as his witness. He claims that the court improperly permitted her to testify that she was frightened of the defendant and that she took his threats to be of a physical, not a professional or political, nature.

On appeal, the defendant claims that the court committed reversible error by admitting the highly inflammatory testimony of Ozga and LaRosa. The defendant failed to preserve the claim and seeks to prevail pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, or under the plain error doctrine. See Practice Book § 60-5. We decline to review his claim, not only because the defendant failed to brief the claim adequately under either doctrine, but also because the defendant induced the claimed error. *Guglielmo* v. *Klausner Supply Co.*, 158 Conn. 308, 317, 259 A.2d 608 (1969). Our Supreme Court has held that review of induced, unpreserved error is not permissible under *Golding*. See *State* v. *Cruz*, 269 Conn. 97, 106, 848 A.2d 445 (2004).

"The term induced error, or invited error, has been defined as [a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the erroneous ruling. . . . it is well established that a party who induces an error cannot be heard to later complain about the error. . . . [T]o allow [a] defendant to seek reversal [after] . . . his trial strategy failed would amount to allowing him to induce potentially harmful error, and then ambush the state [and the trial court] with that claim on appeal." (Internal quotation marks omitted.) *State* v. *DiLoreto*, 88 Conn. App. 393, 397–98, 870 A.2d 1095 (2005).

In this case, the defendant tried the case on the theory that LaRosa previously had made false claims of threat-

ening against him. Despite warnings from the court and concerns expressed by the state, the defendant questioned Ozga about prior instances in which LaRosa had made reports of threats from the defendant and opened the door for the state to inquire as to the nature of those threats. The court was entitled to rely on the defendant's theory of prior falsehoods in ruling on the admissibility of testimony from Ozga and LaRosa that the defendant previously had threatened to harm her. See *Farina* v. *Modzelewski*, 94 Conn. App. 203, 207, 891 A.2d 138 (2006). "[A]ction induced by an appellant cannot be made a ground of error." (Internal quotation marks omitted.) Id.

III

The defendant's third claim is that it was improper under the sixth amendment to the United States constitution and Practice Book § 43-41 for the court, *O'Keefe*, *J.*, not to dismiss the charges against him because he was denied the right to a speedy trial. The defendant's claim lacks merit.

In his appellate brief, the defendant claims that he preserved his claim when he asked Judge O'Keefe on October 28, 2003, to dismiss the charges against him. Our review of the transcript of the proceedings before the court on that date reveals the following facts. The defendant presented the court with oral motions to dismiss his counsel, DuBay, to grant a speedy trial and to dismiss the charges. The majority of the court's time was focused on the defendant's motion to dismiss counsel and to represent himself with the assistance of standby counsel. The defendant also voiced displeasure that he had not been granted a speedy trial. On the court's granting the defendant's motion to dismiss DuBay as counsel, the court granted the defendant's request for a speedy trial.[14] Before the conclusion of

---

[14] Jury selection began within thirty days.

the proceedings, the defendant indicated that there was
a motion to dismiss the charges for "thirty-eight, thirty-
seven and seventy-three."[15] The court told the defendant
that the motion to dismiss did not have to be decided
at that time and could be addressed by the judge who
tried the case, including the charges at issue here. The
defendant responded, "Okay." The defendant has not
brought to our attention facts that would indicate that
he asked the trial court, Judge Holzberg, to rule on the
motion to dismiss, and we can find no written motion
to dismiss signed by the defendant in the court's file.

Our review of the proceedings before Judge Holzberg
discloses that before the jury panel was sworn in for
voir dire, he reviewed the charges against the defendant
with the state and asked if there were preliminary mat-
ters the defendant wanted him to review. At that time,
the defendant voiced a concern as to whether the
charges had been filed within the applicable statute of
limitations. The court assured him that the charges were
filed timely. The court also informed the defendant: "If
your claim concerns a speedy trial, why is it that you
were arrested on or about January 1, 2000, and the trial
is now occurring in November of 2003. That is separate
and independent from the statute of limitations. You
filed your speedy trial motion, of course, a few weeks
ago, which is why we are here today so that you can
have a speedy trial." The defendant then moved on to
another matter.

The defendant claims that the issue has been pre-
served for our review, but that if it has not, that he is
entitled to *Golding* review.[16] The defendant did not,

[15] We assume that those numbers are the last two digits of the docket
numbers of other cases pending against the defendant. The docket number
for the judgment of conviction in this case is CR 0152539.

[16] In order to prevail under *Golding*, all of the following conditions must
be met: (1) the record is adequate for review of the alleged claim of error,
(2) the claim is of constitutional magnitude alleging the violation of a funda-
mental right, (3) the alleged constitutional violation clearly exists and clearly
deprived the defendant of a fair trial and (4) if subject to harmless error

however, brief his *Golding* claim. We cannot determine whether the record is adequate for our review because we cannot find (1) a copy of the defendant's motion to dismiss in the file and (2) any record that his motion to dismiss was brought before Judge Holzberg for a ruling. We are unable to determine from the record why the defendant failed to bring the motion to Judge Holzberg's attention, i.e., an oversight or withdrawal of the motion. The defendant also has not demonstrated that Judge O'Keefe's decision to let the trial judge address the motion to dismiss the charges is of constitutional magnitude. For these reasons, the defendant's claim does not merit review.

## IV

The defendant's fourth claim is that the prosecutor engaged in a pattern of egregious misconduct that deprived him of a fair trial. The defendant cannot prevail on his claim.

The defendant failed to object to what he claims were inappropriate remarks the prosecutor made during the state's final argument. Initially, the defendant asked us to review his claims pursuant to *Golding*, but in his reply brief he sought the appropriate standard of review pursuant to *State* v. *Stevenson*, 269 Conn. 563, 849 A.2d 626 (2004). "We conduct a two step inquiry in analyzing claims of prosecutorial misconduct. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Mulero*, 91 Conn. App. 509, 516, 881 A.2d 1039 (2005), cert. denied, 277 Conn. 912, 895 A.2d 792 (2006), quoting *State* v. *Stevenson*, supra, 572.

analysis, the state has failed to demonstrate the harmlessness of the alleged constitutional violation beyond a reasonable doubt. *State* v. *Golding*, supra, 213 Conn. 239–40; see also *State* v. *DeJesus*, 260 Conn. 466, 472, 797 A.2d 1101 (2002).

"The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . [The court] must view the prosecutor's comments in the context of the entire trial. [*State* v. *Stevenson*, supra, 269 Conn. 571]. The factors to be considered in assessing the prosecutor's actions include the extent to which the misconduct was invited by defense conduct or argument. . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . . *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)." (Internal quotation marks omitted.) *State* v. *Mulero*, supra, 91 Conn. App. 516–17.

The defendant has cited three statements by the prosecutor that he claims were misconduct.[17] Before addressing the statements to determine whether they were misconduct, we note that when addressing the jury, counsel is permitted to argue the facts that are in evidence and the reasonable inferences that can be drawn from them. Id., 520. On the basis of our review of the three incidents in which the defendant claims the prosecutor was guilty of misconduct, we conclude that each comment had a basis in the evidence presented at trial and that there was, in fact, no misconduct.

The defendant claims that the prosecutor improperly called Tanya Caracoglia a liar and stated that it appeared that she had followed in her father's footsteps. The defendant claims that those statements were unfair because they concerned his principal witness. The credibility of any witness, no matter how central to the prosecution or the defense, is always an appropriate

---

[17] He failed to analyze the comments, however, pursuant to the *Williams* factors.

matter for final argument. Given the sad circumstances of this case, i.e., Tanya Caracoglia's intense loyalty to the defendant, which resulted in criminal charges, the defendant personally may have perceived the prosecutor's comments as cruel. Nonetheless, Tanya Caracoglia admitted that at the time the court granted her accelerated rehabilitation, she did not truthfully say that she would offer LaRosa a sincere apology for striking her. Tanya Caracoglia testified that her apology was not sincere. Although appellate courts frown on counsel's expression of personal opinion as to the credibility of a witness, the prosecutor in this case did not state a personal opinion, and his comments were grounded firmly in Tanya Caracoglia's testimony. See *State* v. *Oehman*, 212 Conn. 325, 334, 562 A.2d 493 (1989).

The defendant claims that the prosecutor shifted the burden of proof by asking the jury to focus on the defendant's examination of LaRosa and whether he had asked her any questions having to do with the telephone call of September 11, 1999. The prosecutor pointed out that the defendant's questions pertained to matters unrelated to the charges at hand. We do not see, and the defendant has not explained, how the prosecutor's drawing the jury's attention to these facts shifted the state's burden of proof.

Finally, the defendant claims that the prosecutor assailed his character by suggesting that LaRosa had reason to fear him. In asking the jury to assess LaRosa's credibility, the prosecutor asked the jury to consider that she was not cross-examined by third party counsel but by the defendant, the very man who telephoned her on September 11, 1999. The case cited by the defendant to support his claim, *Dudley* v. *Duckworth*, 854 F.2d 967 (7th Cir. 1988), cert. denied, 490 U.S. 1011, 109 S. Ct. 1655, 104 L. Ed. 2d 169 (1989), is distinguishable. In *Dudley*, the prosecutor asked improper questions of the codefendant to link the defendant in that case to

other wrongdoing. Id., 969, 972. Here, the prosecutor did not improperly elicit evidence, but made use of the facts in evidence to influence the jury's deliberations, which is wholly proper.

V

The defendant's fifth claim is that the judgment of conviction should be reversed because there was insufficient evidence presented for the jury to find him guilty beyond a reasonable doubt of harassment in the second degree and tampering with a witness. We are not persuaded.

The defendant failed to move for a judgment of acquittal at the conclusion of the state's case or before the case was submitted to the jury or to move to set aside the verdict and now seeks to prevail on appeal under *Golding*. "Unpreserved sufficiency claims are reviewable on appeal because such claims implicate a defendant's federal constitutional right not to be convicted of a crime upon insufficient proof. . . . Our Supreme Court has stated that *Jackson* v. *Virginia*, [443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)], compels the conclusion that any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of [*Golding*]. . . . Thus . . . there is no practical reason for engaging in a *Golding* analysis of a claim based on the sufficiency of the evidence . . . ." (Internal quotation marks omitted.) *State* v. *Ashe*, 74 Conn. App. 511, 514, 812 A.2d 194, cert. denied, 262 Conn. 949, 817 A.2d 108 (2003).

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that

the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because [our Supreme Court] has held that a [trier's] factual inferences that support a guilty verdict need only be reasonable." (Internal quotation marks omitted.) *State* v. *Farnum*, 275 Conn. 26, 32, 878 A.2d 1095 (2005).

The substance of the defendant's argument supporting his claim of insufficient evidence is not that the state failed to prove beyond a reasonable doubt an element of either of the charges against him but that the jury chose to believe LaRosa. We have said many times that it is not the province of appellate courts to make determinations of credibility, as that is the right and purpose of the jury. See, e.g., *State* v. *Cais*, 59 Conn. App. 186, 189, 754 A.2d 858 (2000). LaRosa linked the defendant to the anonymous threatening call on the basis of his accent, which the defendant argues is not unique. He further argues that the state failed to substantiate LaRosa's testimony with telephone records. We know of no law that the state was required to produce telephone records to support LaRosa's testimony, and the defendant has failed to provide legal authority to that effect. The testimony of one credible witness is sufficient evidence to convict one accused of a crime.

For the foregoing reasons, we conclude that there was sufficient evidence to convict the defendant of the crimes with which he was charged.

## VI

The defendant claims that the court, *Holzberg, J.*, improperly (1) precluded him from presenting the testimony of most of the witnesses whom he had subpoenaed and (2) ordered him to make a charitable contribution as a means of sanctioning him for misconduct at trial. We decline to review these claims because they have been briefed inadequately.

"[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failing to brief the issue properly. . . . Where the parties cite no law and provide no analysis of their claims, we do not review such claims." (Citation omitted; internal quotation marks omitted.) *Turner* v. *American Car Rental, Inc.*, 92 Conn. App. 123, 130–31, 884 A.2d 7 (2005).

The judgment is affirmed.

In this opinion the other judges concurred.