2009 ME 90

**STATE of Maine**

v.

**Jay R. McLAUGHLIN.**

Supreme Judicial Court of Maine.

Submitted on Briefs: July 8, 2009.

Decided: Aug. 18, 2009.

Janet T. Mills, Atty. Gen., Leanne Robbin, Asst. Atty. Gen., Donald W. Macomber, Asst. Atty. Gen., Augusta, ME, for the State.

Jed Davis, Esq., Jim Mitchell & Jed Davis, P.A., Augusta, ME, for Jay McLaughlin.

Panel: SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, and GORMAN, JJ.

ALEXANDER, J.

[¶ 1] Jay R. McLaughlin appeals from the judgments of conviction entered in the Superior Court (Somerset County, *Jabar, J.*) following a jury-waived trial on one count of theft by deception (Class C), 17–A M.R.S. § 354(1)(B)(4) (2008), and one count of intentionally violating environmental protection laws (Class E), 38 M.R.S. §§ 349(1), 1306(1) (2008). McLaughlin argues that the court erred in: (1) denying his motion for judgments of acquittal because the facts of the case do not support conviction under the statutory definition of each offense, and (2) limiting the scope of his cross-examination of the State's witnesses. We affirm the judgments.

## I. GOVERNING STATUTES

[¶ 2] Because the terms of the statutes defining the two crimes at issue are central to the questions presented on this appeal, the relevant portions of the statutes defining the offenses are stated as the first items in this opinion.

### A. Theft by Deception

[¶ 3] The pertinent parts of the theft by deception statute, 17–A M.R.S. § 354 (2008), read as follows:

1. A person is guilty of theft if:

A. The person obtains or exercises control over property of another as a result of deception and with intent to deprive the other person of the property. Violation of this paragraph is a Class E crime; or

**B.** The person violates paragraph A and:

. . . .

(4) The value of the property is more than $1,000 but not more than $10,000. Violation of this subparagraph is a Class C crime.

. . . .

2. For purposes of this section, deception occurs when a person intentionally:

**A.** Creates or reinforces an impression that is false and that the person does not believe to be true, including false impressions as to identity, law, value, knowledge, opinion, intention or other state of mind;

. . . .

3. It is not a defense to a prosecution under this section that the deception related to a matter that was of no pecuniary significance or that the person deceived acted unreasonably in relying on the deception.

[¶ 4] Thus, a person is guilty of theft by deception if that person "obtains or exercises control over property of another as a result of deception and with intent to deprive the other person of the property." 17–A M.R.S. § 354(1). A "deception" occurs when a person intentionally "[c]reates or reinforces an impression that is false and that the person does not believe to be true." 17–A M.R.S. § 354(2)(A). An "intent to deprive" another person of property means "to have the conscious object . . . [t]o withhold property permanently or for so extended a period . . . that . . . the use and benefit of the property[ ] would be lost." 17–A M.R.S. § 352(3)(A) (2008).

[¶ 5] Clarifying the statutory definitions, we have held that "reliance is an essential component of the crime of theft by deception." *State v. Young*, 1998 ME 107, ¶¶ 12–13, 711 A.2d 134, 137 (holding that the theft by deception statute "expressly requires a causal connection between the defendant's deceptive act and the acquisition of control over another's property"). However, it is not a defense to theft by deception that the person from whom property was taken acted unreasonably in relying on the deception. 17–A M.R.S. § 354(3).

**B. Intentional Violation of an Environmental Law**

[¶ 6] Title 38 M.R.S. § 349(1) provides that:

[A] person who intentionally, knowingly, recklessly or with criminal negligence violates a law administered by the [D]epartment [of Environmental Protection], including, without limitation, a violation of the terms or conditions of an order, rule, license, permit, approval or decision of the board or commissioner . . . commits a Class E crime.

[¶ 7] The environmental protection law alleged to have been violated in this case is 38 M.R.S. § 1306(1) governing creation or operation of a "waste facility." Section 1306(1) specifies that it is "unlawful for any person to establish, construct, alter or operate any waste facility without a permit issued by the [DEP]." 38 M.R.S. § 1306(1). A "waste facility" is defined to mean "any land area, structure, location, equipment or combination of them, including dumps, used for handling hazardous, biomedical or solid waste, waste oil, sludge or septage." 38 M.R.S. § 1303–C(40) (2008). To "handle" waste means, among other things, to store, collect, or dispose of waste. 38 M.R.S. § 1303–C(14) (2008). The creation or operation of a "waste facility," within the meaning of the statute, does not require any frequency or regularity of use, except that a facility used for ninety days or less to store hazardous wastes generated on the same premises is excluded from the definition of waste facility. 38 M.R.S. § 1303–C(40)(B).

## II. CASE HISTORY

[¶ 8] The statutory definitions of the offenses must be considered in reviewing the case history. When reviewing a claim that the evidence does not support a finding of guilt, we review the evidence and inferences that may be drawn from the evidence in the light most favorable to the trial court's judgment to determine whether the trial court rationally could find each element of the offense proved beyond a reasonable doubt. *State v. Drewry*, 2008 ME 76, ¶ 32, 946 A.2d 981, 991; *State v. Smen*, 2006 ME 40, ¶ 7, 895 A.2d 319, 321.

[¶ 9] Viewed most favorably to the trial court's judgment, the evidence in the record indicates the following. In 2006, a logging operation was being conducted in Cornville. A "feller-buncher" or "harvester" was a major piece of equipment being used in the logging operation. The harvester, in working condition, was worth approximately $100,000. On October 3, 2006, a fire heavily damaged the harvester. After extinguishing the fire, the local fire department placed oil absorbent pads in the vicinity of the harvester. After the fire, the harvester was observed to be leaking hydraulic fluid and off-road diesel fuel. In the days following the fire, a neighbor of the property placed more absorbent pads in the vicinity of the harvester to contain the oil spill. He replaced those pads as they became saturated. He was concerned that the oil might contaminate his family's well.

[¶ 10] The harvester was insured by Peerless Insurance Company. The owner of the harvester contacted Peerless on the day of the fire and made a claim for the loss. After investigation, Peerless concluded that the harvester was a total loss. On October 20, 2006, Peerless paid the owner the value of the harvester and took ownership of it. Peerless then sought someone who would be interested in purchasing the harvester and removing it from the woods for its $6000 salvage value.

[¶ 11] Jay McLaughlin operated a logging company in the Medway area. He claimed to have observed or been involved in approximately one hundred environmental clean-ups similar to what would be necessary to clean up the area of oil leaked from the harvester. McLaughlin, the high bidder, offered Peerless $6000 for the harvester. In addition, he undertook to perform a proper clean-up of the oil spilled from the harvester.

[¶ 12] Peerless had estimated the upper limit of its clean-up cost responsibility to be $5000 for debris removal and $10,000 for pollutant clean-up. Peerless asked McLaughlin to evaluate the level of contamination at the site when he went to the site to retrieve the harvester. Peerless also authorized McLaughlin to grade the area in order to allow the harvester to be moved and to remove pollutants from the site. Peerless agreed to pay McLaughlin $2500 to clean up and remove the oil pollutants and debris from the site.

[¶ 13] At trial, a Peerless representative testified that McLaughlin had indicated that he was qualified to handle the site clean-up and that he would remove all of the contaminated soil and water from the site, so that Peerless would not need to hire anyone else to undertake clean-up work. McLaughlin testified that he conducted a site clean-up on October 25 and 26, filling approximately thirty five-gallon buckets with leaves, soil, debris, mud, and oil that had contaminated the site. He stated that he had placed those five-gallon buckets in the cabs of the harvester and the excavator that he used to move the harvester. The neighbor who lived adjacent to the site testified that after McLaughlin had removed the harvester from the site, he observed the harvester and the excavator used to move the har-

vester and saw no five-gallon buckets that McLaughlin had claimed were in the cabs of each. All that the neighbor observed in the harvester were oil soaked pads that the neighbor himself had put in the harvester.

[¶ 14] The neighbor visited the site and saw trees felled over the area where the harvester had burned. He also observed that the ground in the area had been smoothed over. Starting to dig, the neighbor discovered oil-soaked pads under the smoothed area of ground and under the felled trees that had been placed on top of the site where the harvester had burned. The neighbor then called Peerless and the Department of Environmental Protection (DEP) to report his concerns that the site was not being adequately cleaned up. Later investigation by the neighbor, also apparently reported to Peerless, identified oil-contaminated soil and a second site, strewn with shale, where appeared that contaminated soil removed from the original site had been dumped.

[¶ 15] Upon being contacted by Peerless, McLaughlin claimed that, as of October 26, he had removed the contaminated oil, and he advised Peerless that the former owner of the harvester would have a DEP representative come to inspect the site.

[¶ 16] To avoid potential contamination of his well from heavy rains and at the DEP's request, the neighbor dug up the contaminated soil and other materials found at the location, placed them on plastic, and covered them with more plastic to prevent further contamination before the DEP had a chance to do a site review. When a DEP representative visited the site on October 31, 2006, the DEP determined that the materials collected by the neighbor were contaminated with petroleum products.

[¶ 17] Also on October 31, 2006, McLaughlin billed Peerless $2500 for his clean-up work, including "removal of water contaminated with oil and diesel"; "removal of soil contaminated with oil and diesel" and; disposing "properly" of contaminated water, soil, and oil absorbent rags. Together with the bill, McLaughlin sent Peerless a check in the amount of $3500 for purchase of the harvester. The following day, he told Peerless "everything is cleaned up to the best of his abilities." Peerless then accepted the check for $3500 for the purchase of the harvester, assuming that McLaughlin had done the work that he had represented that he had done.

[¶ 18] Subsequently, the neighbor had 9.46 tons of contaminated material removed from the site and transported to a waste management facility. The DEP then contacted Peerless, advising that they had "major concerns" regarding McLaughlin's clean-up work. Peerless took the position that site clean-up was McLaughlin's responsibility, not its responsibility. After this contact, Peerless transferred title of the harvester to McLaughlin. At trial, a Peerless representative testified that it would not have accepted $3500 in payment for the harvester if it had known that McLaughlin had not taken the actions described in his invoice and completed clean-up of the site.

[¶ 19] Following McLaughlin's indictment, the case was heard in a jury-waived trial. At the conclusion of the evidence, the court found McLaughlin guilty of both charges. After sentencing, McLaughlin brought this appeal.

## III. LEGAL ANALYSIS

### A. Theft by Deception

[¶ 20] The indictment charged McLaughlin with theft by deception in the aggregate value in excess of $1000, making it a Class C crime. The asserted theft by deception was committed by: (1) obtaining

the harvester, the property of Peerless Insurance Company, for $2500 less than the agreed-upon purchase price as a result of a deception, and (2) intentionally creating or reinforcing the impression that McLaughlin had conducted a clean-up of the spill of diesel fuel and hydraulic oil discharged after the fire, combined with the fact that this impression was false and McLaughlin did not believe it to be true, thus violating the theft by deception law, 17–A M.R.S. § 354.

[¶ 21] Although McLaughlin contested the State's evidence that he created any deception, or that he undertook to do a complete clean-up of the site in return for a reduced price for the harvester, the available evidence must be viewed most favorably to the judgment in this case. *Smen*, 2006 ME 40, ¶ 7, 895 A.2d at 321. That evidence demonstrates that McLaughlin obtained control of and title to the harvester from Peerless. Further, he obtained the harvester for $3500 rather than the agreed-upon price of $6000. There is no dispute that McLaughlin intended to keep the harvester and thus deprive Peerless of it for the reduced price. The evidence further supports the conclusion that McLaughlin falsely claimed that he had cleaned up the harvester site and had removed petroleum-contaminated materials from the site. The trial court could have reasonably concluded that the thirty five-gallon pails that McLaughlin claimed he had used to clean up the site and remove materials did not in fact exist. The trial court could also have concluded that the discovery of contamination at the site immediately after McLaughlin had left the site, and the later removal of over nine tons of contaminated material from the site, demonstrated that McLaughlin had done little or nothing to clean up the site, other than cover over the petroleum-contaminated earth and dump some oil and contaminated soil at a different site.

[¶ 22] This evidence supports the trial court's conclusion that McLaughlin intentionally created the false impression that he had cleaned up the site and that he knew this impression was false when he deceived Peerless Insurance with the bill claiming $2500 for a clean-up that had not occurred. Further, there is evidence to support the fact that Peerless relied on McLaughlin's deception and accepted the $3500 check and then transferred title to the harvester to him in reliance on his false statement that he had cleaned up the site.

[¶ 23] Although Peerless may have been on notice from others that McLaughlin may not have cleaned-up the site as he had claimed, this notice to Peerless in no way excuses McLaughlin's acts or amounts to a defense to the charge of theft by deception. *See* 17–A M.R.S. § 354(3).

[¶ 24] A theft by deception occurs when a defendant obtains another person's property as a result of a deception. That deception may occur by changing containers or prices of an item in a store, or by falsely claiming to have performed services that were a prerequisite for acceptance of a reduced price of an item.[1] The fact that the owner obtained some compensation for the item does not avoid the theft charge when the reduced compensation is accepted as a result of the

1. This case, when the deception occurred before the owner transferred the item and accepted a reduced price because of the deception, must be distinguished from the case when the owner transfers an item in return for a promise of future payment or performance of services. This opinion does not address whether or not a person commits a theft by deception if that person receives an item as a result of a promise of future payment or performance of services, but, upon receipt of the item, does not plan to pay or perform. *See* 17–A M.R.S. § 354(2)(A) (2008); *State v. Nelson*, 1998 ME 183, 714 A.2d 832.

defendant's deception that deprives the owner of the stated price for, or the full value of, the item.

[¶ 25] As a result of McLaughlin's intentional deception, and Peerless's reliance on his deception, McLaughlin obtained the harvester from Peerless for $2500 less than the price McLaughlin had agreed to pay. Thus, each of the elements of the basic crime of theft by deception was proved beyond a reasonable doubt. Further, the court found that the value of the loss to Peerless as a result of reliance on McLaughlin's deception was in excess of $1000, making the theft by deception a Class C crime.

[¶ 26] The record supports the court's finding of guilty on the charge of theft by deception (Class C).

## B. Intentional Violation of Environmental Protection Laws

[¶ 27] McLaughlin asserts that he did not engage in an intentional violation of the environmental protection laws for purposes of 38 M.R.S. §§ 349(1), 1303–C(40), 1306(1) because he did not establish, construct, alter, or operate a "waste facility" as a result of his one-time disposal of petroleum contaminants on private property or his failure to clean up petroleum contaminants deposited on private property after he had undertaken to do so. Taken most favorably to the State, the evidence indicates that, during removal of the harvester, McLaughlin, using an excavator he brought to the site, dug up contaminated soil, petroleum, and associated debris from the place where the harvester burned and moved it to and dumped it at another place in the woods in the vicinity of the harvester fire. The issue becomes whether this one-time removal of contaminated waste and dumping it at another place constitutes an establishment or construction of a waste facility proscribed by 38 M.R.S. § 1306(1).

[¶ 28] As discussed previously, the definition of "waste facility" includes no criteria for frequency of use other than the ninety-day exemption for storage of certain products at a site where the hazardous wastes were created. *See* 38 M.R.S. § 1303–C(40). No question of storage is raised here. By moving oil, contaminated soil, and debris to a different location and dumping it at that previously uncontaminated location, McLaughlin created a waste facility as defined by law and thus violated that law. The court also could find that McLaughlin's actions were intentional and that he knew he was violating the laws by dumping contaminants at this newly-created waste facility. McLaughlin had indicated to Peerless that he was fully familiar with the procedures and requirements for cleaning up contaminated sites. Therefore, the evidence was sufficient to support the court's conviction of McLaughlin on the charge of intentional violation of the environmental protection laws.

## C. Evidentiary Objections

[¶ 29] McLaughlin asserts that he was deprived of the opportunity to effectively cross-examine two of the State's witnesses by not being able to ask them certain questions that he now claims, on appeal, were essential to demonstrate problems with the credibility of each witness. However, the exact nature of the questioning alleged in McLaughlin's brief to us was not made apparent to the trial court during the course of the examinations at issue. We see no obvious error demonstrated by the court's rulings, *see State v. Snow*, 2007 ME 26, ¶ 11, 916 A.2d 957, 961, particularly given the court's wide latitude to limit examinations sought on marginally relevant issues, *see State v. Robinson*, 2002 ME 136, ¶ 15, 803 A.2d 452, 457–58.

[¶ 30] In its findings and its rulings on the evidence, the trial court committed no reversible error.

The entry is:

Judgments affirmed.